# Richmond

## D. E. PREDDY v. COMMONWEALTH OF VIRGINIA.

January 14, 1946.

Record No. 3036.

Present, All the Justices.

The opinion states the case.

*Nottingham & Nottingham*, for the plaintiff in error.

*Abram P. Staples, Attorney General*, and *V. P. Randolph, Jr., Assistant Attorney General*, for the Commonwealth.

CAMPBELL, C. J., delivered the opinion of the court.

D. E. Preddy, sixty-seven years of age, was tried upon an indictment, pursuant to the provisions of section 4767 of Michie's Code, which charged him with an attempt to rape Joyce Josephine Jackson, a female child of the age of ten years. He was tried by a jury which found him guilty and fixed his punishment at three years in the penitentiary. The defendant moved the court to set aside the verdict on the ground that it was contrary to the evidence and the law, but the court overruled this motion and pronounced judgment in accordance with the verdict.

· The first assignment of error challenges the verdict of the jury and the judgment of the court, on the ground that the evidence adduced by the Commonwealth is not sufficient to sustain the verdict found and the judgment entered.

Joyce Jackson testified that at the time of the trial she was eleven years of age; that she was a fifth grade pupil in the public school of Gordonsville, Virginia, her home town; that on the day of the alleged crime she, in company with her cousin, Lozella Harlowe, met the accused, with whom she was acquainted, on the street in Gordonsville; that he engaged her and her cousin in conversation and told her he had some candy for them; that after this conversation she went to her home and finding her mother was out working, asked of her grandmother permission to go to the home of the accused; that when she and her little cousin (who was eight years old), arrived at the home she found the accused there; that he met them in the hall and they went into a room and sat down; that he told Lozella to go into the garden and get some things (vegetables); that after Lozella left the room he told her he had some comic books in the back room for her; that when they arrived in the back room accused threw her on a bed; that she tried to "holler" but on account of the dust which smothered her, she was unable to do so; that he pulled down her bloomers; that he kneeled on one of her arms and began to "bother her" with his hands; that she could not "holler" on account of the dust; that she could not tell if he put his hand "inside her," but that he hurt her when he "bothered" her; that her "panties" had

something on them; that while she was on the bed and he was "bothering" her, her grandmother came to the back porch and accused got up, opened the door and went to where her grandmother was on the back porch, picked up a box and said to her that the little girl was not getting the right "stuff" and he went to the garden; that during the time he was "bothering" her he did not expose any part of his person; that she was scared and did not tell her grandmother what had happened; but that she told her mother sometime afterwards of her experience.

Rosa Dean, the grandmother, testified that she gave her two granddaughters permission to go to the home of accused, but that she told them not to be gone over half an hour; that when they failed to return, she became uneasy and went to the home of the accused; that she saw the little girl in the garden as she approached the house; that she entered the hall of the house and the accused came out of a room on the left side; that Joyce also came out of the room; that accused came out on the back porch, "grabbed" up a box and said, "I'll get you some nice squash. She is not getting good ones," and then went into the garden; that when he came out on the porch "he was darting around like he was scared to death about something;" that he brought back some vegetables and gave them to her and then she went home; and that Joyce preceded her home and did not tell her what had occurred. She fixed the date of her visit as "about" the 12th of July.

On cross examination Mrs. Dean admitted that she had been convicted of "bootlegging" in 1931 or 1932.

Lozella Harlowe, the companion of Joyce Jackson, testified in detail in regard to the invitation of the accused to visit him at his home and specifically testified that he sent her to the garden to gather vegetables while Joyce remained in the home with accused at his invitation to look at some comic books; that she saw Joyce enter the room with the accused; and that before she left the house accused gave them some candy.

Zelda Dean testified that she was the mother of Joyce Jackson; that she was divorced from her husband, Jackson, and had resumed her maiden name of Dean; that on the 22nd day of July she was cleaning her room and found, secreted behind a mirror on the dresser, a pair of silk pants belonging to Joyce which had some blood upon them; that she questioned Joyce who then told her "about it."

J. H. Freed, the town sergeant of Gordonsville, testified as follows:

"Q. Mr. Freed, Mr. Preddy here is charged with attempted rape on Joyce Jackson. Did you investigate the case, Mr. Freed?

"A. I did.

"Q. What facts did you find in your investigation?

"A. The girl's mother came to me on Saturday afternoon, July 22nd, and told me that she was afraid something had happened to her daughter but she wouldn't tell her anything, and asked me what I thought she had better do. I told her the main thing was to try to find out from the child if anything really had happened. She went back and talked to her and came to me again and told me the girl had told her something and she wanted me to come up there.

"By the Court:

"Q. You say the girl's mother or brother?

"A. Her mother. She wanted me to come up there and said the girl would tell me what had happened, so I went up there and she told me what had taken place and I told the girl's mother I thought she should take her to the doctor and have her examined. I took her to the doctor and had her examined and brought her back home and told her mother what the doctor had told me and came to Orange and got the warrant and I arrested Mr. Preddy that afternoon.

"By Mr. Higginbotham:

"Q. Did you have any conversation with Mr. Preddy in reference to the case?

"A. He didn't express himself in any shape or form.

"Q. Did you ask him if he did what he is charged with?

"A. No, I did not.

"Q. Did you ask him anything?

"A. I just read the warrant to him and he was shaving at the time and he asked me if he could finish shaving and I told him he could. After he finished shaving I brought him on.

"Q. When you read the warrant to him did he deny the charge in the warrant?

"A. He did not deny it.

"Q. That was on July 22nd she was taken to the doctor?

"A. Yes, sir."

On cross-examination he stated that Joyce told him that the occurrence took place on July 12th.

Dr. W. C. Mason testified as follows:

"The patient was brought to me by the town sergeant around 2:30 in the afternoon, the 22nd day of July, for examination, and told me her mother thought she had been raped—gave a history of bleeding at the vagina for several days—said this happened around ten days ago, the rape. I had one of the nurses from the hospital drape her and had her with me during the examination. On examination I found the labia majora and labia minora swollen and slightly bluish. On separating the labia majora I found the hymen to be torn, and the edges of the torn hymen to be red, not as yet healed. The mucous membrane of the hymen was red. There was no bleeding from the vagina at this time although there was a slight whitish discharge. Diagnosis: Bruised condition of the vagina; lower part of the labia majora and labia minora bruised, and a torn hymen, from some cause external to the body.

"Q. That was what your examination of her revealed?

"A. Yes, sir."

Dr. Mason, when examined by counsel for the accused, testified that in his opinion the girl's condition could not have existed over three or four days or the entrance to the hymen would have shown more healing; that the lacerations could have been caused by falls on a fence, or from stradling

a rail or board; that while the injury could have been caused by a man's hand, it was not probable that it was.

Zelda Dean, recalled for further examination, testified that to her knowledge or information her daughter had never sustained any injury which might have produced the lacerations she suffered.

The accused testified that he was sixty-seven years of age; that he was born and reared in Orange county, Virginia, and resided in Gordonsville; that he formerly engaged in mercantile business; that he had not been thus engaged for five or ten years, he could not recall the exact time; that Joyce Jackson and Lozella Harlowe visited him on July 1st, and not at the time stated by them; that at the time of their visit Willie Verdier, a barber, was present cutting his hair; that he was not guilty of the offense charged against him; that he had undergone several operations (not designated), and that he did not have "any sexual capacity."

Willie Verdier testified that on the day he cut the hair of accused the children were present; that he did not see anything unusual happen; that the children were at the home when he left; that he could not recall the day of the month the children were present.

By reason of the earnest contention of the able counsel representing the accused that the evidence offered by the Commonwealth was inconsistent and incredible, we have deemed it necessary to set forth the case of the prosecution in all its sordid details.

It may be conceded that Joyce Jackson was unable to fix the exact date of the alleged attempt and that some of her statements were inconsistent. However, when testifying as to the actual occurrence, her statements were concrete and, as evidenced by the stamp of approval placed upon them by the jury, most convincing. The jury were the sole judges of the credibility of the witness and the conflict in the evidence has been resolved against the accused. As we comprehend the evidence, there is not even the semblance of phantasy suggested. Had Joyce Jackson been coached to tell her story, it occurs to us (as it must have occurred to the

jury) that she would have testified that accused, at the time he had her upon the bed pinned down with his knee on her arm, that he had his privates exposed. Such a statement would have placed the attempt beyond the realm of speculation as to what accused intended to do.

■ Counsel contends that "the jury did not accept as true the story of the prosecutrix. Otherwise, they would not have given him the minimum punishment when it might have been death or life imprisonment." The contention is untenable.

Wide discretion is given the jury in cases of this nature when it comes to the fixing of punishment. No doubt the fact that accused was beyond the meridian of life and had theretofore borne a good reputation had some weight with the jury in fixing the punishment. The verdict of the jury comes to this court with the stamp of approval of a careful and able judge who, like the jury, heard the witnesses testify, observed their demeanor and by his action vouched for their credibility.

■ There is no merit in the first assignment of error.

It is assigned as error that the court erred in giving this instruction to the jury:

"The Court instructs the jury that physical impotency is not a defense to the crime of attempted rape, and if they shall believe from the evidence beyond a reasonable doubt that the defendant, D. E. Preddy, intended to have carnal knowledge of Joyce Jackson and did any overt act towards the accomplishment of that purpose, they should find him guilty, even though they may believe that the accused D. E. Preddy at the time of such overt act was physically incapable of the consummated act of having carnal knowledge of Joyce Jackson."

The basic contention of accused is that the instruction tells the jury that impotence is not a defense to the crime of attempted rape.

The question whether or not an adult who claims to be impotent is incapable of committing the crime of attempt to rape is one of first impression.

Counsel contends that the rule established by this court in *Foster* v. *Commonwealth*, 96 Va. 306, 31 S. E. 503, 42 L. R. A. 589, 70 Am. St. Rep. 846, is the applicable law in the instant case.

The sole question presented in the *Foster Case* was "whether a boy fourteen years of age is capable under the law of committing the crime of rape, or of the attempt to commit it."

An analysis of that case reveals that at common law an infant under the age of fourteen years was conclusively presumed to be incapable of the crime of rape, or of attempting to commit it. "This presumption rests upon the ground of impotency rather than the want of discretion, * * * for an infant may be principal in the second degree, as aiding and assisting in the commission of this offense as of others, if it appears by evidence that he had sufficient mischievous intent." Davis's Criminal Law, p. 25.

In holding that the common law obtained in Virginia under the provision of sec. a, Code of 1849 (now sec. 2, Michie's Code), Judge Riely had this to say:

"The accused being under fourteen years of age, and conclusively presumed to be incapable of committing the crime of rape, it logically follows, as a plain, legal deduction, that he was also incapable in law of an attempt to commit it. He could not be held guilty of an attempt to commit an offence which he was physically impotent to perpetrate."

That the *Foster Case, supra,* is not in point is easily demonstrated. In that case the court was dealing with the sole question of juridical incapacity. Juridical, as defined in Anderson's Dictionary of Law, means: "Pertaining to the distribution of justice." In the language of Lord Hale, "If the law should not animadvert upon such offenders by reason of their nonage, the country would come to confusion."

In Wharton's Criminal Law (12th ed.), sec. 223, it is said: "If there be juridical incapacity for the consummated offense (*e. g.,* infancy) there can be no conviction of the attempt; and therefore a boy under fourteen (14) cannot,

according to the prevalent opinion, be convicted of an attempt to commit rape as a principal in the first degree. It is otherwise, where the incapacity is merely nervous or physical. A man may fail in consummating a rape for some nervous or physical incapacity intervening between attempt and execution. But this failure would be no defense to the indictment for an attempt. At the same time there must be apparent capacity."

In the case at bar, we are dealing with the question of alleged physical incapacity. Neither at common law nor by statute is an adult clothed with the presumption that he is incapable of committing the crime of rape, or an attempt to rape.

"According to the decided weight of authority, both in England and in this country, an apparent possibility to commit the crime is enough." Clark and Marshall, Crimes, sec. 123.

In Wharton's Criminal Law (10th ed.), section 552, it is said: "Impotency is a sufficient defense for the consummated offence, though not for an assault with intent." See Wharton & St. Med. Jur., sec. 20.

In an illuminating article in 78 Penn. Law Review, p. 971, it is stated:

"When a defendant, with rape in mind, and with the expectation of accomplishing penetration, seizes his female victim in the customary manner in order to achieve his purpose and finds penetration impossible, because of impotency, the authorities agree that he is guilty of a real criminal attempt to rape, and his impotency has no bearing on the case except possibly negativing the specific intention to accomplish penetration."

In *Commonwealth* v. *Shaw*, 134 Mass. 221, the court approved this instruction:

"If the defendant assaulted a child with intent carnally to know and ravish her, the jury would be authorized to convict him, although he might have found it, in making the attempt, physically impossible to consummate his intent

by actual sexual intercourse with the body of the child in the position as described."

It must be conceded that intent is the crucial question in cases of attempt to rape. But when it is shown by the evidence that the accused did any overt act showing intent, then the crime is consummated. This has been the rule of law in this Commonwealth since our decision in *Lufty* v. *Commonwealth*, 126 Va. 707, 713, 100 S. E. 829. Over the objection of the accused, in that case, the trial court gave the following instruction:

"The court instructs the jury that if you believe from the evidence beyond a reasonable doubt that Ethel Garrison is under fifteen years of age, and if you further believe from the evidence beyond reasonable doubt that the accused, Moses Lufty, attempted by force to have intercourse with her, and that he did any overt act toward carrying out that purpose, such as taking hold of her, or throwing her down, then he would be guilty of attempted rape as charged in the indictment in this case."

In approving the instruction, Kelly, J., said:

"It is claimed that this instruction ignored the defendant's view of the case. His view simply was that he was not guilty, and the instruction expressly recognized that view by imposing upon the Commonwealth the burden of proving beyond a reasonable doubt that he did the things which were recited in the instruction, and the doing of which plainly rendered him guilty of attempted rape."

That this rule of law is now firmly established in this jurisdiction is evinced by the decision of this court in *Granberry* v. *Commonwealth, ante,* p. 674, 36 S. E. (2d) 547, this day handed down. Mr. Justice Hudgins, delivering the opinion for the court, reaffirmed the rule in this language:

"The indictable offense for an attempt to commit a crime consists of an intent to commit a felony and the doing of some direct act towards its consummation without actually committing the crime itself. It need not be the last proximate act to the consummation of the crime in contemplation, but it is sufficient if it be an act apparently adapted to

produce the result intended. *Glover* v. *Commonwealth*, 86 Va. 382, 385, 10 S. E. 420; *Merritt* v. *Commonwealth*, 164 Va. 653, 180 S. E. 395; *Rainey* v. *Commonwealth*, 169 Va. 892, 895, 193 S. E. 501; *Mullins* v. *Commonwealth*, 174 Va. 477, 5 S. E. (2d) 491; *Taylor* v. *Commonwealth*, 180 Va. 413, 416, 23 S. E. (2d) 139."

We are of opinion that there is no error in the judgment of the circuit court and that it must be affirmed.

*Affirmed.*

BROWNING, J., dissenting.

I do not think that the Commonwealth has proven the case against the defendant beyond a reasonable doubt and this, notwithstanding the verdict of the jury. I think that the testimony of Dr. Mason, who is a distinguished physician, if there were nothing more, casts grave doubt upon the guilt of the accused. Of this, of course, he should have the benefit.