# LOUIS GORDON McFADDEN *v.* STATE OF MARYLAND

[No. 221, Initial Term, 1967.]

512

*Decided July 24, 1967.*

The cause was argued before ANDERSON, MORTON, ORTH, and THOMPSON, JJ., and O'DONNELL, J., Associate Judge of the Eighth Judicial Circuit, specially assigned.

*Edward B. Rybczynski* for appellant.

*David Mason, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *Richard Swisher, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MORTON, J., delivered the opinion of the Court.

The Appellant, Louis Gordon McFadden, was convicted of manslaughter on June 7, 1966, by Judge Joseph R. Byrnes, sitting without a jury, in the Criminal Court of Baltimore, and sentenced to ten years in the Maryland Penitentiary.

The record shows that on February 23, 1966, Katharyn Garrison was pronounced dead on arrival at Sinai Hospital. She was two and a half years old, two feet ten inches tall, weighed twenty five pounds and wore a cast on her right leg because of a congenital bone disease. She was pronounced dead by a hospital pediatrician who testified that the child was examined a few minutes after her arrival at the hospital by ambulance and it was the doctor's opinion that the child had expired several minutes prior to the examination. The doctor stated that the child's body was covered with mulitple bruises of varying sizes and ages; there was blood around her nose, mouth and behind her ear and scratches on her chest. When asked to estimate the number of bruises on the child's body, the doctor stated that "I wouldn't be surprised if there were at least a hundred." The doctor further testified that three months prior to the terminal examination, the child had been examined at Sinai Hospital because of a fall down a flight of stairs; at that time there were no bruises on the child and the only injury was a "bump on

the middle of the forehead." The doctor expressed the opinion that the bruises were not of the type or number that would result from the child's having a tendency to fail down as a result of the leg cast's impediment to her walking. Because of the nature of the child's injuries, the doctor felt that the case should "be brought to the attention of the Medical Examiner."

The Assistant Medical Eaxminer testified that an autopsy was performed on February 25, 1966; that the external examination of the child revealed "a great variety of bruises that involves almost all portions of the body—bruises, scrapes, and cuts or lacerations;" that he estimated the number of bruises to be a minimum of 60 to 80 and the oldest bruises occurred within two weeks and the more recent ones within a few days of the child's death. An examination of her skull, he testified, disclosed a subdural hemorrhage. A microscopic examination of the skin bruises showed that the subcutaneous fat or soft tissue was disrupted and had entered the blood stream. This fat was carried by the blood stream to the heart where it obstructed small blood vessels and caused muscle fibres in the heart to die from a lack of nourishment. It was the Doctor's opinion that the foregoing combination of factors caused the child's death.

The child's mother testified that in addition to the deceased child, she had a five year old son; that she was divorced; that she and McFadden had been living together as common law husband and wife; that she worked during the day and left the children under the supervision of McFadden, who was unemployed. She stated that McFadden had disciplined the deceased child from time to time by slapping her but she did not think that "the slap was hard enough to do her any damage." The mother stated that on the day of the child's death, she received a telephone message from McFadden to come home at once; that upon her arrival she found the child lying on a bed and not breathing; that in an effort to revive the child she slapped her on the back, tried hitting the child on the chest as a form of external heart massage and attempted mouth to mouth resuscitation. The ambulance, which she had called for upon entering the house, then arrived and took the child to the hospital.

A detective of the Baltimore Police Department testified that on March 17, 1966, he sent a message to Mrs. Garrison and McFadden requesting them to come to his office the next morning for an interview. The detective testified that in the course of the interview, McFadden, who at that time said his name was Lewis Gordon, stated that "he hit the child about the head and body at least once a day for about a month." At this point the detective asked him if he were willing to give a written statement and when McFadden agreed, the officer proceeded to take the statement. It was of the question and answer type and contains the following colloquy:

"Q. Before you say anything, I want to advise you that anything you say can be used in a Court of law. Any statement you make must be voluntary and of your own free will. We are not \threatening you in any way and we are not making you any promises. I also wish to advise you that you do not have to tell us at this time and if you wish,. you may consult an attorney. Do you still wish to tell us about this?
A. Yes, sir, I want to clear this thing up." * * *
"Q. In your statement, Mr. Gordon, you stated that you corrected the child by smacking her, how long has this procedure been going on?
A. I guess it's been going every day for about a month.
Q. What parts of the body did you strike the child when correcting her?
A. I smacked her on the tail different times, but mostly it would be on her cheeks when she wouldn't eat. I remember smacking her on the back the day this happened because I thought she was choking." * * *
"Q. When you state that you struck the child because she was crying, what was the reason for this?
A. I have a temper and I fly off the handle quickly and I remember that I have struck the child sometimes when I was in a fit of temper.
Q. Were you in this state of mind on February 23, 1966, just before the child was taken to the hospital?
A. Yes I would say so. I was nervous at that time

and I smacked her for not eating. I smacked her in the face, but I don't know whether I smacked her on the legs or what, I don't remember that."

Shortly after signing the statement, McFadden was interviewed by the Assistant Medical Examiner and he told the Examiner substantially the same story as given in the written statement. The Medical Examiner was permitted during the trial to relate the story given to him by McFadden.

At the completion of the State's case, counsel for McFadden made a motion for judgment of acquittal. The Court said:

"I will grant your motion on the first count only, as to first degree."

At the conclusion of the entire case the Court found the Appellant guilty of manslaughter.

In this appeal, it is first contended that by granting the motion on the charge of first degree murder, the court was thereafter precluded from finding the Appellant guilty of manslaughter "because there was only one degree of murder charged and only one count in the indictment." The indictment, which contained a single paragraph, was in the form prescribed by Maryland Code, Article 27, Section 616, and charged that the Appellant "feloniously, willfully and of deliberately premeditated malice aforethought did murder Katharyn Garrison * * *." The validity of the statutory form of indictment was upheld in *Neusbaum v. State,* 156 Md. 149 (1928); *Wood v. State,* 191 Md. 658 (1948); *Kelley v. State,* 181 Md. 642 (1943). Under this form of indictment an accused may be found guilty of murder in the first degree, murder in the second degree or manslaughter. *Carroll v. Warden,* 205 Md. 631 (1954). Accordingly, it was not error to find the Appellant guilty of manslaughter after granting a motion for judgment of acquittal of first degree murder.

The Appellant also contends that the lower court erred in not granting the Appellant's motion for judgment of acquittal at the end of the State's case. Although the Appellant did not testify, Mrs. Garrison was called to testify on his behalf. By going forward with this testimony, the Appellant's motion for

judgment of acquittal was withdrawn. Maryland Rule 755b. However, in a non-jury trial, this court will review the case upon both the law and the evidence, but the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses. Maryland Rule 1086; *Jason v. State,* 1 Md. App. 136; *Nicholson v. State,* 229 Md. 123 (1962). In reviewing the sufficiency of the evidence in a non-jury trial it is the function of this Court to determine whether the evidence, if believed, either shows directly or supports a rational inference of the facts to be proved, from which the court could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged. *Chittum v. State,* 1 Md. App. 205, 209; *Crum and Dunbar v. State,* 1 Md. App. 132; *Duffy v. State,* 243 Md. 425; *Jones v. State,* 242 Md. 323; *Kucharczyk v. State,* 235 Md. 334; *Ponder v. State,* 227 Md. 570, 572.

In *Neusbaum v. State, supra,* the Court of Appeals of Maryland stated at page 155:

> "Manslaughter has been defined to be "the unlawful and felonious killing of another, without malice aforethought, either express or implied, and is either voluntary or involuntary homicide, depending upon the fact whether there was any intention to kill or not." (1 Wharton Cr. Law., par. 421.)"

It is clear from the evidence, that the child's death resulted from the injuries sustained by her and that the injuries were the result of the Appellant's voluntary course of conduct. In our opinion, there was ample evidence from which the trial court could find the Appellant guilty of manslaughter.

The Appellant next contends that the trial court erred in not ruling, *sua sponte,* that his oral and written statements were inadmissible. The Appellant concedes that the statements were received in evidence without objection on the part of the trial counsel (who was not appellant's counsel in this appeal). In fact, the record shows that counsel for the Appellant specifically indicated that he did not contest the voluntariness of the statements.

Under Maryland Rule 1085, this Court, with certain exceptions not present in this case, will not ordinarily decide any point or question which does not plainly appear by the record to have been tried and decided by the lower court. The Appellant argues, however, that under the holding in *Ledbetter v. Warden,* 368 F. 2d 490 (1966), it cannot be held that he waived his right to question the admissibility of the statement because his counsel's concession as to the voluntariness of the statement and his failure to object to their admissibility are not binding upon him unless it is shown that he specifically authorized his counsel to pursue such a course of action.

Before discussing *Ledbetter,* it should be pointed out that McFadden's trial was prior to June 13, 1966, the effective date of *Miranda v. Arizona,* 384 U. S. 436, and, accordingly, the standards set forth therein are not applicable here. See *Johnson v. New Jersey,* 384 U. S. 719; *Westfall v. State,* 243 Md. 413; *Johnson v. Warden,* 244 Md. 384.

In *Ledbetter,* the Fourth Circuit Court of Appeals, in a three to two decision, affirmed the District Court, which, after conducting a plenary hearing, ruled that statements taken from him by the police and used at his trial had been obtained in violation of the Due Process Clause of the Fourteenth Amendment and that "the failure of Ledbetter's trial counsel to object to the admission of these statements did not constitute an intelligent waiver under the standards laid down by the Supreme Court."

Ledbetter, a 19 year old first offender, with an eighth grade education, was sentenced to life imprisonment upon his conviction of first degree murder. It appears that after his arrest he orally made incriminating statements to a police officer while awaiting formal interrogation; and later, after being questioned by six officers, signed an inculpatory statement. Both statements were used at his trial without objection.

Judge Sobeloff, in speaking for the majority, stated:

"We agree with the District Court that from the totality of circumstances, Ledbetter's confessions were obtained in violation of his due process rights. This youth was alone in the hands of the police, and his re-

quests to contact his family were refused. He was not told of his right to maintain silence, or that his statements might be used against him. And he was not informed of his right to an attorney. Considered against the background of Ledbetter's age and education we think the District Court correctly found that the confessions were not voluntarily given." [Citations omitted]

"When Ledbetter was refused permission to make a phone call he knew full well that the police intended to hold him incommunicado and pursue their interrogations until they would bear fruit. The crucial inquiry is the suspect's knowledge that he will continue to be kept incommunicado. The coercive influence cannot be measured by the number of hours Ledbetter was actually detained, but only by the effect upon him of the obvious intention of the police to persist in their secret inquisition without granting his request to communicate with the outer world."

It is apparent that few, if any, of the factors which compelled the Federal Courts' findings of involuntariness in *Ledbetter* are present in this case. McFadden was thirty years of age, had an extensive criminal record and was accompanied by his common law wife to the initial police interview. His original oral statement was clearly not an "in custody" statement. Cf. *Campbell v. State*, 244 Md. 363, 366. The excerpt of the testimony heretofore set out shows the extent to which he was advised of his consitutional rights prior to giving the written statement. The oral statement to the Assistant Medical Examiner was given by the Appellant immediately after he signed the written statement. While it is true that the Appellant was not again apprised of his constitutional rights, it is our opinion that under the circumstances of this case, the failure to so advise him does not affect the admissibility of the oral statement, since it was substantially the same as, and simply corroborative of, the written statement, and was given within an hour after the police officer had advised him of his constitutional rights as set forth above.

Considering the totality of circumstances, it is our opinion that the Appellant's statements were not coerced or products of a will overborne. Cf. *Davis v. North Carolina,* 384 U. S. 737 (1966). We are mindful of the " 'increasingly meticulous' standards of voluntariness" which Judge Sobeloff stated were applied by the District Court in *Ledbetter,* and we believe that Appellant's written and oral statements meet these standards of voluntariness.

Having passed upon the admissibility of the Appellant's statements it becomes unnecessary to consider the question of waiver.

The Appellant's final contention with respect to the competency of trial counsel is not properly before us since it was not raised in the lower court. Maryland Rule 1085; *Brown v. State,* 237 Md. 492.

*Judgment affirmed.*