WINFIELD SCOTT WATERS *v.* STATE OF MARYLAND

[No. 287, Initial Term, 1967.]

*Decided October 18, 1967.*

218

The cause was argued before MURPHY, C. J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*Walter D. Webster* for appellant.

*Edward F. Borgerding, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, David T. Mason, Assistant Attorney General,* and *Robert D. Horsey, State's Attorney for Somerset County,* on the brief, for appellee.

ORTH, J., delivered the majority opinion of the Court. MURPHY, C. J., dissents. Dissenting opinion by MURPHY, C. J., at page 228, *infra.*

The appellant, who testified that he was 80 years of age, was convicted of assault with intent to rape in the Circuit Court for Somerset County before Judge William W. Travers, presiding without a jury, and sentenced to imprisonment for the remainder of his natural life.[1]

A motion for judgment of acquittal was made at the close of

---

1. Indictment No. 1859 charged assault with intent to rape by the first count and assault and battery by the second count. Indictment No. 1860 charged burglary of the dwelling house of the prosecutrix. The trial court found the appellant guilty on the first count of indictment No. 1859 and stated that "the other counts are dismissed because of merger." It is clear from the record that the court included the burglary indictment as a count so dismissed. We agree that the assault and battery merged into the assault with intent to rape under the circumstances of the instant case but do not agree that the burglary was so merged as it is not a necessary ingredient of assault with intent to rape. See *Chittum v. State,* 1 Md. App. 205. We feel, however, that under the circumstances here present, the "dismissal" of the burglary indictment was the equivalent of a finding of not guilty as it did not merge into the crime for which the appellant was convicted. Therefore we do not consider the contentions raised by the appellant on this appeal with regard to the burglary charge.

all the evidence and denied. Maryland Rule, 755. The relevant questions raised by the appellant on this appeal go to the sufficiency of the evidence to sustain the conviction and he contends that there was "insufficient identification of the appellant as the perpetrator" of the crime and that "there was no evidence to establish specific intent to rape."

The prosecutrix, a teacher in the high school in Princess Anne, testified that she lived alone since the death of her husband. About 3:30 A. M. on May 23, 1966, she was awakened by something—"I have no idea what"—and, when she sat up in bed and placed her feet on the floor, "was immediately grabbed around the upper part of my body — around about midway, the upper part of my arm—so that my arms were pinned to my sides." She began to scream and she and her attacker fell to the floor, knocking over a bedside table. She realized that the storm windows would make it unlikely that anyone could hear her and although the telephone, which was on the bedside table, was knocked off the cradle when the table was overturned and she shouted her name, telephone number and "help", she could not get close enough to the phone to dial something to attract the operator. She continued to resist with all her strength and grabbed the hair on the back of her attacker's head and beat his head on the floor. He said, "You are hurting my head. If you will let go my hair I will leave you alone." She let go his hair and he grabbed her hair and began beating her head on the floor. The left side of her face was badly bruised and the inside of her cheek was cut; she was swallowing blood. She offered her attacker money if he would leave her alone and he made no comment. She prayed and pleaded with him to leave because she had a heart condition, having had a coronary in 1943. He only said, "So you have a bad heart, do you." She realized that the only hope of saving herself was to wedge herself under the bed—there was a clearance of $7\frac{1}{4}$ inches between the side of the bed and the floor—and was able to turn over on her stomach and inch herself under the bed with her head sideways "because there wasn't room to get my head under any other way." As she was attempting to do this, her attacker was "straddle my hips" and told her he had a knife. He pulled at the back of her pajama pants which were "elasticized

in the back and buttoned on the side. And fortunately the button held." He shifted his position and grabbed both ankles, attempting to pull her out from under the bed, but she held on to the bed slats and was able to stay under the bed. Finally, he said, "How much money are you going to give me" and she said "not a red cent, until you get out of this house completely." There was no further mention of money. The bedroom was small, 10 feet by 10 feet. The bed had been pushed against a chest of drawers during the struggle and it would have been very difficult for him to turn the bed over. Unable to dislodge her, he said, "If you call me a taxi I will leave." She made no reply. He then said, "If I find my hat I am going to leave you." He turned on a flashlight and she saw a grey felt hat on the floor just outside the bedroom door. He said, "I can't find it. Will you get it for me?" She replied, "No; quit your lying and pick it up." He picked up the hat and she saw the inside of his hand and his wrist and ascertained he was a Negro. He left the house. She telephoned a neighbor who came over and telephoned the State Police. The prosecutrix testified that she realized that if she was to have any means of identification she must listen very carefully to the voice of her attacker. She also noticed that he had a pronounced odor, similar to the odor of wood smoke. When she grabbed her attacker by the hair she found that there was not enough hair on the top of his head "to get hold of" and the hair she grabbed was toward the back of his head which was relatively small in size. After her attacker had left she found "a chunk of hair," which she turned over to the police. The neighbor whom the prosecutrix telephoned testified that she called him about 3:50 A.M. and that he went right over to her house. He said she "was in quite a state of shock" and he described the condition of the bedroom—pill bottles, a radio, table lamp and clock all strewn on the floor. He called the police and stayed until they arrived. Sergeant Robert D. Weir of the Maryand State Police responded to the call and obtained an account of the occurrence and a description of the attacker from the prosecutrix. From the information he received and the chunk of hair turned over to him by the prosecutrix he was looking for a Negro male, "at least aged or weak" who had a moderate level voice, not

speaking with a "regular colored accent," receding hair with some missing from the back part of his head and a peculiar odor "like wood smoke." The hair found at the scene was of fine texture and a blend of gray, black and copper in color. When the sergeant received the information and saw the hair, "the first thing that crossed my mind" was the appellant, whom he knew but had not seen for several years. He found the appellant at his home and observed that on the back of the appellant's head there were "red pin marks" as if hair had been pulled out. The appellant went with the police officers to the State Police Barracks and the sergeant conversed with him within hearing of the prosecutrix. She was certain the voice of the appellant was the same voice she heard in her home during the attack on her.

## THE IDENTITY OF THE ATTACKER

There was evidence legally sufficient for the trial court to find that the appellant was the person who assaulted the prosecutrix. Testimony and physical evidence properly admitted at the trial led to no other rational conclusion. The prosecutrix positively identified the voice of the appellant as the voice of the person who attacked her. A hat in possession of the appellant when the police went to his home was identified by the prosecutrix as the one she saw on the floor outside her bedroom. The hairs recovered in the bedroom, upon examination by the Federal Bureau of Investigation, were found to have been forcibly removed from the head—pulled out by the roots. They were dark brown to white in color and had been chemically treated with a coloring substance to darken them. They originated from a member of the Negro race. They were identical to the hairs from the appellant's head. A physician who examined the appellant shortly after the commission of the crime observed that the appellant had a raw area approximately the size of a quarter, left posterior head, which was evident of recent loss of hair, indicating that the hairs had been pulled from the head, the scalp not having the "shiny slick appearance" of loss of hair by baldness or disease. The hair of the appellant was thin and dyed with "shoe polish, or some type of dye." A bottle of Black Strand hair coloring was found in the appellant's home. In the debris removed from the prosecutrix's pajama top on its examination by the Federal Bureau of Investi-

gation were white, reddish brown and brown woolen fibers which miscroscopically matched the fibers composing the trousers of the appellant. The appellant met the description given by the prosecutrix, not only generally, as for example with respect to race and receding hairline, but in the rather unusual characteristics observed by her. She said that he had a peculiar odor, like wood smoke. When the police saw the appellant at his home he was wearing "eyebrow pencil or some sort of eyebrow fashion." The appellant testified that he colored his eyebrows by burning paper, crumbling it and putting it on his eyebrows. The police found in his home a cardboard cone from a roll of toilet paper, which cone had been partially burned. While the attacker was in the bedroom of the prosecutrix he used a flashlight, and a flashlight was found in his home. Upon examination by the physician, the appellant had three one-inch scratches on the right posterior neck and a small pin-size abrasion of the right anterior head. Certainly, the allegations of the appellant that he was never in the home of the prosecutrix, that the hat introduced in evidence was not his hat, that his loss of hair was from poison oak, that he did not "wrestle" with the prosecutrix, that he had no scratches on his neck or bruise on his hand, and that he did not dye or use coloring in his hair are not credible. The trial court was under no obligation to believe them. *Gopshes v. State,* 1 Md. App. 396. We cannot say that the finding of the trial court that the appellant was the person who assaulted the prosecutrix was clearly erroneous. Maryland Rule, 1086; *Tingler and Wright v. State,* 1 Md. App. 389.

## THE ASSAULT WITH INTENT TO RAPE

The appellant contends that there was no legally sufficient evidence of assault with intent to rape. We find ample evidence of the assault. In addition to the summary of evidence before the court herein set forth, a physician, specializing in internal medicine, testified that his examination of the prosecutrix about six hours after the attack disclosed a swelling of the right thumb, a swelling and blue discoloration of the left cheek and jaw, a bruise of the right knee and right ankle, a contusion of the right hip and left breast, a one-inch diameter discoloration of

the right breast, a contusion of the right elbow, scratches on the back, on the chest and tenderness of the right rib cage. On further examination about five days later there was a hematoma of the right calf.

Having determined that the assault, which is one element of the offense, and the identity of the appellant as the one committing the assault, are amply supported by the evidence, the nub of the case becomes the proof of intent. As the Court of Appeals said in *Davis v. State,* 204 Md. 44, 51 (a prosecution for assault with intent to murder) : "Since intent is subjective and, without the cooperation of the accused, cannot be directly and objectively proven, its presence must be shown by established facts which permit a proper inference of its existence." See also *Shipley v. State,* 220 Md. 463 and *Holtman v. State,* 219 Md. 512, holding that felonious intent may be inferred from the circumstances. Here it may be argued that the evidence permits an inference that appellant's purpose in entering the dwelling was to burglarize it and that the assault was occasioned by the prosecutrix awakening and discovering him, the violence of assault being due to the resistance of the victim. But there is no evidence that the appellant attempted to steal anything. It appears that the appellant entered by way of the back porch and kitchen door on the first floor, but there was no evidence of a search of the first floor or a search of the rooms on the second floor before the assault. Since she was in night clothes in bed it would not be expected that he would search her person as well or at least that he would begin his search in such a manner. Nor is there any evidence of an attempt to steal after the assault when the prosecutrix was in a relatively helpless position under the bed, although it seems probable that if burglary had been his intent he would have then begun searching for valuables. When at the height of the assault, the prosecutrix offered him money if he would leave her alone, he showed no interest, not even making a comment at that time. The appellant was an experienced burglar. At the time of his trial he was on parole from a conviction of burglary in 1963. Since 1914 he had been convicted some nine times for burglary, breaking and entering, receiving stolen goods and related crimes. His conduct in this case was hardly consistent with that of an experienced

burglar following his profession. Nor do we believe that the evidence shows merely a wanton assault. There is no evidence that the appellant and the prosecutrix knew each other before the commission of the crime. The record is devoid of evidence that the assault was motivated by revenge or bad blood between the parties.

On the contrary, while in the instant case there is no "co-operation by the accused" to show his intent (he denied even being on the premises), we feel that the evidence before the trial court supported a rational inference from which it could fairly be convinced, beyond a reasonable doubt, that the appellant committed the assault with intent to rape. The testimony of the prosecutrix indicates that she was not only courageous but intelligent. It appears clear that she believed that the appellant intended to attack her carnally. She resisted his advances with all her strength for some fifteen or twenty minutes, using every means to escape him. In her testimony that the appellant was pulling at the back of her pajama pants, she said "And fortunately the button held." While her pleas, prayers and offer of money for him to leave her alone could, of course, have resulted from a mistaken fear on her part that he intended to rape her, and for this reason is not conclusive proof of guilt, we do think it some evidence that it was the prosecutrix's person that appellant was after and not her possessions. There was other evidence of the circumstances of the attack from which this intent on the part of the appellant may be deduced in addition to that which we have noted in discussing the probability that the intent was burglary or robbery. For some time during the struggle he was "straddle" her hips and pulled at her pajama pants. Although the testimony indicates she was on her stomach at that time, we think these actions are also some evidence of his intent to ravish. He attempted to pull her from her place of safety under the bed by grabbing her ankles and was not successful only because she was able to hold on to the bed slats. The bed was too close to the floor for him to fulfill his intention while she was beneath it, and unable to dislodge her physically, he attempted to persuade her to come out by trickery. He asked her how much money she would give him and was told, "Not one red cent, until you get out of this house completely."

There was no more mention of money. He then made the ridiculous assertion that if she would call him a taxi he would leave. Not receiving an answer he attempted to lure her from beneath the bed by saying if he could find his hat he would leave. She told him, "There is your hat in the hall floor." He replied that he could not find it and asked her to get it for him. The prosecutrix said, "NO; quit your lying and pick it up." It was only then that he left the house. Further, there is the evidence that the appellant had been blackening his hair and his eyebrows. We think this at least an indication that the appellant did not want to accept the fact of his advanced years and to be consistent with an intent on his part to attempt to prove to himself his sexual abilities. From the evidence of the nature of the assault and the circumstances surrounding it, we think that the trier of the facts could have fairly concluded beyond a reasonable doubt that the appellant intended to rape the prosecutrix, that he had not voluntarily abandoned his purpose, that he intended to use force to carry it out, and that this was the reason for the violent assault which he undoubtedly committed against her.

This Court has repeatedly stated that in reviewing the sufficiency of the evidence in a non-jury trial, it is its function to determine whether the evidence, if believed, either shows directly or supports a rational inference of the facts to be proved, from which the trial court could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged. *McFadden v. State,* 1 Md. App. 511 and cases cited. The weight of the evidence is a matter for the trier of facts to determine. *Dunlap v. State,* 1 Md. App. 444. As the Court of Appeals said in *Cooper v. State,* 220 Md. 183, 192:

> "The question is not whether we *might* have reached a different conclusion from that of the trial court, but whether the trial court had before it sufficient evidence upon which it could fairly be convinced beyond a reasonable doubt of the defendant's guilt of the offense charged; and the verdict of the trial court is not to be set aside on the evidence unless clearly erroneous."

We are not prepared to say that, on the evidence, the verdict

226

was clearly erroneous. Therefore in accordance with Maryland Rule 1086, the judgment will be affirmed.

The appellant suggests that physical inability to engage in "sexual activity" is a defense to the crime of assault with intent to rape and because of the appellant's advanced age "it is difficult to conceive that Appellant would have had * * * any physical ability to so engage himself." It has been said that aggravated assaults are nothing more than attempts to commit murder, rape, or robbery (*Clark and Marshall, Crimes,* Sixth Ed. §4.07, p.218), a view apparently followed in this State. See *Farrow v. State,* 233 Md. 526, 533. Therefore the rules of law applicable to attempts are applicable to aggravated assaults. Legal impossibility to commit the intended crime may be a valid defense and where the impossibility arises by operation of law the accused cannot be convicted of an attempt. So at common law a boy under 14 years of age cannot commit the crime of rape and thus cannot be convicted of attempted rape.[2] *Clark and Marshall, supra,* §4.12, p.228; *Wharton's Criminal Law and Procedure,* (Anderson), vol. 1, §78, p.163. We know of no authority holding that this legal impossibility extends beyond the age of 13 years or, to put it another way, that it is applicable to a man of advanced years. However, legal impossibility has been distinguished from factual impossibility. While there can be no attempt in a case involving legal impossibility, as attempting to do what is not a crime is not attempting to commit a crime,[3] factual impossibility of success does not prevent

---

2. See *Savoy v. Warden,* 216 Md. 616, in which the Court said:
"The petitioner even though he was only fourteen when he was convicted and sentenced, was subject to prosecution for both common law and statutory rape as well as assault with intent to rape and assault and battery."
Although the Court did not elaborate on this statement, it would appear it had in mind the common law rule.

3. If a certain act of forcible intercourse with a woman does not constitute rape (husband and wife) an attempt to do so, does not constitute an attempt to commit rape, even if it does constitute the crime of assault and battery. It is the same if the husband made the attack in the dark, mistaking his wife for some other woman. The actual attempt, as distinguished from a mental abstraction, was to have an act of intercourse which was not rape. *Perkins on Criminal Law,* (University Textbook Series) Ch. 6, §3, A5, p.494.

the attempt from being made. Physical incapacity to commit a crime does not affect the capacity of one to be guilty of an attempt. Thus a man who is physically impotent may be guilty of an attempt to commit rape. *Wharton, supra,* §78, p.163; *Clark and Marshall, supra,* §11.01, p.677. It is stated in *Perkins on Criminal Law,* (University Textbook Series) Ch. 6, §3, B, p.502:

> "Suppose, for example, by reason of extreme age or some nervous disorder, a man has lost the ability to engage in the act of sexual intercourse although unaware of his weakness. He could intend to commit rape, and his inability to copulate would not make it impossible for him to commit a battery. Hence he could be guilty of an assault with intent to commit rape even if the statute requires present ability for the assault."

See also 78 U. Pa. L. Rev., 962, 971 (1929-1930), *Impossibility Affecting Criminal Attempt,* Strahorn. The weight of authority supports this view. *People v. Peckham,* 232 Cal. App. 2d, 163, 42 Cal. Rptr. 673 (1965); *State v. Ballamah,* 28 N. M. 212, 210 Pac. 391 (1922); *Hunt v. State,* 114 Ark. 239, 169 S. W. 773 (1914); *State v. Bartlett,* 127 Iowa 689, 104 N. W. 285 (1905); *Preddy v. Commonwealth,* 184 Va. 765, 36 S. E. 2d 549 (1946); Annotation 26 A.L.R. 772. It is clear from the authority cited by *Perkins* in support of the phrase "although unaware of his weakness" and from the authorities above cited, that evidence of known impotency is admissible as relevant to the question of intent to commit rape as a matter to be considered by the trier of facts with other relevant evidence, or as *Strahorn,* supra, said "* * * his impotency has no bearing on the case except as possibly negativing the specific intent to accomplish penetration." However, in the instant case, there was no evidence that the appellant was impotent or that he was incapable of copulation or penetration or if so that he was actually aware of it. A man may commit the crime of rape if he is capable of penetration although not capable of emission or procreation and penetration, however slight, will sustain a conviction. *Craig v. State,* 214 Md. 546. He admitted to having "sex-

ual relations with a woman" five or six years ago. In reply to a question, "Well, could you bother with a woman if you wanted to?" he replied, "I don't know. I doubt it very much. I doubt it very much. A man my age is no good for anything, only sleeping and eating, and waiting for the time to come to be buried." The latter part of his answer is belied by his actions with respect to the prosecutrix regardless of his intent in the assault on her, showing that he had not reached the state of disability he would have the court believe. Nor does his doubt that he could "bother with a woman" preclude a finding that he attempted to resolve the question by assaulting the prosecutrix with an intent to rape. In any event, as we have noted, an impotent man, incapable of copulation or penetration may commit assault with intent to rape.

*Judgment affirmed.*

MURPHY, C. J., dissenting:

I agree with the court that the evidence was legally sufficient—indeed it was overwhelming—to establish that appellant was the person who entered the prosecutrix's home and assaulted her. I cannot, however, agree that the evidence before the trier of fact supported a rational inference from which it could fairly be convinced, beyond a reasonable doubt, that appellant possessed the specific intent necessary to convict for the crime of assault with intent to rape. See *Cooper v. State,* 220 Md. 183.

An assault with intent to rape is an assault coupled with the intent to commit an act which would constitute the crime of rape, if completed. The essential ingredients of the crime are (a) an assault; (b) an intent to have carnal knowledge of the female and (c) a purpose to carry into effect this intent with force and against the consent of the female. Wharton's *Criminal Law and Procedure,* (Anderson Edition), Section 323; 75 C.J.S. *Rape,* Section 20. As the court correctly points out, the nub of the offense is proof of intent—namely, that it was the purpose and design of this eighty-year old appellant to have intercourse with the prosecutrix, against her will, by force, and regardless of resistance. I find no such legally sufficient evidence in this case.

That a burglar undertakes by force to "neutralize" a female victim who awakes and arises in the course of a burglary does not, of itself, furnish any proof of an intent to rape. That premise conceded, it does not follow that where the victim refuses to be so "neutralized," and the burglar finds it necessary to overcome the victim's resistance, that he thereby becomes motivated with a purpose to rape, particularly where, as here, the burglar is eighty years of age.

What followed the initial encounter between the appellant and the prosecutrix was a violent struggle, covering some fifteen minutes in time, the course and intensity of which is well illustrated by the following testimony of the prosecutrix:

> "We continued to fight—scuffle. I was able to get hold of a chunk of hair from my attacker's head; and I began beating his head against the floor. He said, 'You are hurting my head. If you will let go my hair I will leave you alone.' I did. And immediately he grabbed my hair and began beating my head against the floor—particularly the left side of my face—which was badly bruised. * * *"

That appellant on one occasion during the struggle emerged sitting on top of prosecutrix as she lay face down on the floor, and pulled at her pajama bottom and at her ankles to restrain her from crawling underneath the bed, does not, in light of the origin, nature and course of the struggle, convert into a sexual attack what had quite plainly become a vindictive purpose on appellant's part to cause injury to the prosecutrix while overcoming her opposition—a purpose kindled no doubt by the fact that not only had she pounded his head against the floor, but had also yanked out the remaining hair on his head by its very roots.

The court characterizes the struggle as one in which the prosecutrix resisted appellant's "advances" and states that it is clear that she believed that he intended to attack her carnally. Not once in her testimony, however, did the prosecutrix make any reference to a sexual assault or any act, words or conduct on appellant's part which to her manifested such a purpose. The court attempts to synthesize the requisite intent to rape by knit-

ting together such factors as a lack of evidence that appellant intended to steal anything; that there was no evidence that he searched any other rooms in the house; that he was silent when in the course of the struggle the prosecutrix offered him money; that appellant, though a seasoned burglar, did not conduct himself in a manner consistent with an intent to steal; that in an effort to trick the prosecutrix out from underneath the bed so that he could rape her, he asked her to call him a taxi and to help him find his hat; and that appellant's use of artificial hair color demonstrated a propensity, in his advanced years, toward commission of sexual acts.

To conclude on the basis of the aforegoing evidence that the appellant's intent was to rape the prosecutrix cannot, in my judgment, be justified by any rational inference-drawing process. Considering all the circumstances of the case, not the least of which is that appellant was eighty years of age at the time of the crime, convinces me that appellant's actions and conduct were too equivocal and too enigmatical to mount up to any legally sufficient evidence of proof of an intent to rape.