## COOPER *v.* STATE

[No. 242, September Term, 1958.]

*Decided June 8, 1959.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Solomon Baylor* for the appellant.

*James O'C. Gentry, Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General, J. Harold Grady, State's Attorney for Baltimore City,* and *Julius A. Romano, Assistant State's Attorney,* on the brief, for the appellee.

BRUNE, C. J., delivered the opinion of the Court.

The defendant, Jerry Paul Cooper, was tried before a judge, sitting without a jury, in the Criminal Court of Baltimore on a charge of assault with intent to rape and was found guilty. He filed a motion for a new trial, which was denied, and he was subsequently sentenced to life imprisonment and was ordered to be sent to the Patuxent Institution for examination as a possible defective delinquent. He appeals from the judgment and sentence.

At the time of the offense charged against him Cooper, a Negro youth of low mental capacity, was nineteen years old. He had been in difficulty before. Efforts to rehabilitate him at Boys' Village had not been successful. He was committed to Crownsville State Hospital first in 1954, again in 1955 and still a third time early in 1956. He was released after each commitment—on the third occasion after nine months' treatment, during which he was reported to have responded well to efforts at rehabilitation.

He was arraigned on April 11, 1958, upon the indictment in this case and upon two other indictments (one for rape and the other for purse-stealing) with which we are not now concerned. The trial judge, being informed that the defendant had been in Crownsville, ordered that he be given a medical examination, and ascertaining that he had no counsel and no funds with which to employ counsel, appointed counsel for him. He was

examined on April 15th and 21st by Dr. Guttmacher, the Chief Medical Examiner of the Supreme Bench, who reported under date of May 9th that he considered Cooper to be "technically responsible," but "very seriously defective intellectually." Dr. Guttmacher reported a current finding by Dr. Ainsworth that Cooper's Full Scale I.Q. was 56 (which was also what it had been found to be on a previous occasion by Crownsville State Hospital), which classified him as a "borderline imbecile."

On May 21, the above medical report was filed in the Clerk's office (not to be opened without the court's permission). Cooper submitted under pleas of not guilty and of not guilty by reason of insanity and he was thereupon committed to Crownsville State Hospital under Code (1957), Art. 59, Sec. 11, for observation and report. The Superintendent filed a report dated July 17, with the court which stated (in part) that the diagnosis had remained unchanged as "Mental Deficiency, Primary, Moderate (I.Q. 67) with Behavioral Reaction," that technically the defendant knew the difference between right and wrong regarding the specific charges against him, that there was some question as to whether he was fully aware of the consequences of his actions, but that it was the opinion of the staff that he was "not psychotic and legally is considered a responsible agent" and that he could cooperate with counsel in his own defense. The report also expressed the view that the defendant fitted the definition of a defective delinquent contained in Code (1957), Art. 31B, Sec. 5.

On September 18, 1958, the plea of not guilty by reason of insanity was withdrawn, and the case proceeded to trial.

The appellant contends first, that there was no sufficient proof of the *corpus delicti* to warrant the admission of a statement made by him to the police, and second, that the evidence, even including the statement, was insufficient to warrant his conviction.

The indictment charged assault with intent to rape and also common assault upon a Mrs. Edith Malone. It is not disputed that Mrs. Malone, who was then seventy-two years old, was assaulted by the defendant on Sunday, March 23, 1958, at about 7 A.M., that the assault occurred in the kitchen of her home, which was on the first floor of a house on West Fayette Street

in Baltimore, that Mrs. Malone's left hip was broken and that she had to be hospitalized. She remained at the hospital for several weeks and then returned to her home. She soon afterwards contracted an illness, which was conceded not to have been caused by or connected with the assault, from which she died on May 29, 1958. Her testimony, consequently, was not available to the State when this case came up for trial and much is, therefore, left to inference which might otherwise have been made clear, or at least clearer.

Assault, which is one essential element of the offense charged, is, as above indicated, amply supported by the evidence. The nub of this case is the proof of intent. As Judge Hammond, speaking for the Court, said in *Davis v. State,* 204 Md. 44, 51, 102 A. 2d 816 (a prosecution for assault with intent to murder) : "Since intent is subjective and, without the cooperation of the accused, cannot be directly and objectively proven, its presence must be shown by established facts which permit a proper inference of its existence." Here, there was at least some "cooperation by the accused" in the statement which he made to the police, but the defendant's first claim is that it was improperly admitted because of the insufficiency of other evidence to establish the *corpus delicti.* We may note that there is no contention that the statement was not voluntarily made.

There is room for some question as to whether the statement constitutes an admission or a confession, the distinction between which is pointed out in *Ford v. State,* 181 Md. 303, 307, 29 A. 2d 833, and in *Delnegro v. State,* 198 Md. 80, 87, 81 A. 2d 241, and is referred to in *Zerwitz v. State,* 205 Md. 357, 361, 109 A. 2d 67, and in *Bollinger v. State,* 208 Md. 298, 307, 117 A. 2d 913. Perhaps the nature of the statement in the instant case is best described in the words of Chief Judge Bond in *Markley v. State,* 173 Md. 309, 314, 196 A. 95, as a statement in the nature of a confession. As in the *Zerwitz* case the statement here seems to fall short of a direct admission of guilt, since guilt could only be inferred from it. However, the State has treated the statement as a confession and we shall so consider it for the purposes of this case.

The statement itself, so far as now material, is as follows: "Every once in a while I feel like I want to get something from

some white woman, you know what I mean, I want a little bit because I like it better when I get it from a white woman instead of a colored woman. I had it from three white girls before. Well I was walking along the 1300 block of Fayette Street. I walked into the hall way and knocked on a door. A white woman opened the door and I asked her if she wanted to buy a paper. I always use this excuse for talking to a woman. She said she did not want one. I asked her if her husband was home and she said no, that he went out to buy a paper. This woman then slammed the door shut. The next thing that I knew this woman started opening the third door down the hall. I ran back to this door and pushed it open so hard that the door hit her and knocked her to the floor. I bent over her and put my hand around her waist and told her not to holler, but she hollered anyway. I heard some one running down the steps from upstairs and the next thing I knew four men were holding onto me and held onto me until the police came. That woman fell down the second time after I let go of her. I didn't knock her down the second time because I was scared and heard some one coming."

The above statement was given on March 24, 1958. Three or four weeks later the defendant gave a somewhat different account of what had happened in his statement to the Medical Examiner, which was included in the latter's report and which, together with the Crownsville report, was put in evidence by the defendant after the close of the State's case. The defendant did not testify. The explanation given the Medical Examiner included the following: "In regard to the attempted rape charge, which involves an older woman, he said, 'I went into a lady's house, I asked her if she wanted a paper. I didn't have none but I could have brought her one if she had said yes. That was on the corner on Calhoun Street and she called me a black nigger and slammed the door. Then I got mad and shoved it in and knocked her down with the door. She started to scream. I tried to help her up and her son came in. She said I tried to rape her. I didn't have no intentions to rape her. She was an old woman, I think around sixty-four'. When asked why he thinks the woman reacted in this way, he said, 'Maybe she didn't like colored people'. It is not too clear to

this Examiner whether he had knocked on this woman's door or knocked on a neighboring door and she opened it to see why someone was knocking. Patient says he was so frightened when she fell that 'I couldn't move out of my tracks, that's when the guy caught me'."

Dr. Guttmacher cautioned in his report that "Individuals who are as defective as this patient are highly suggestible and their confessions must be weighed with great circumspection." We have no reason to doubt that the trial court took this warning into consideration. Dr. Guttmacher also expressed the opinion that the "elaborate story" told by the defendant "in regard to the rape" should be viewed more seriously than most such defenses, since it seemed questionable that the defendant could be capable of inventing such a defense. It appears, however, that the "elaborate story" related to an entirely different offense from that for which the defendant was indicted in the present case.

Quite apart from the defendant's statement to the police, there was testimony by the son of the victim of the attack that he had stayed overnight with his mother at her apartment on West Fayette Street and that he was awakened at about seven o'clock on the morning of March 23, 1958, by "a loud thudding noise and screams" which he could tell were of female origin but could not say for sure were his mother's. He rushed out into the hallway and saw that the door to the kitchen, the room next to his bedroom, was open. Entering the kitchen he saw his mother lying on the floor in the center of the room. The appellant, his back to the door, "was backing away" from Mrs. Malone and she was screaming "Get away from me" and for help. The witness wrestled with appellant as he tried to escape and managed, with the assistance of two other occupants of the building who arrived on the scene, to restrain him until the police arrived. Malone testified that from a quick glance upon entering the kitchen he thought his mother's bathrobe "was open" while she lay on the floor and was "up on her legs maybe to her knees, maybe not quite so high up." However, he also testified that he thought she was lying on her right side, that she was not otherwise exposed in any manner, and that the

appellant was fully dressed, had nothing in his hands and was not exposed.

The evidence certainly permits an inference that appellant's purpose in assaulting Mrs. Malone was either to rob or rape her. Had the former been his intent it is probable that once she was in a comparatively helpless position he would have begun searching the apartment for valuables. Since she was in night clothes it would not be expected that he would search her person as well or at least that he would begin his search in such a manner. Her screaming "Get away *from me*" could, of course, have resulted from a mistaken fear on her part that he intended to attack her carnally. For this reason it is not conclusive proof of guilt, but we do think it is some evidence that it was Mrs. Malone's person that appellant was after and not her possessions.

There is also the possibility suggested in the defendant's statement to the Medical Examiner that anger engendered by Mrs. Malone's alleged remark to him caused him to shove the door in after she had slammed it and that he thereby knocked her down. In the same statement he quoted Mrs. Malone as saying that he had tried to rape her, but denied that he had done so. The trial judge was not bound to believe this exculpatory or partially exculpatory statement of the defendant. *Webb v. State,* 201 Md. 158, 162, 93 A. 2d 80; *Kier v. State,* 216 Md. 513, 140 A. 2d 896; *Shockley v. State,* 218 Md. 491, 148 A. 2d 371. Evidently the judge did not believe this exculpatory explanation by the defendant.

The general rule, which is recognized in this State, is that an extrajudicial confession of the accused does not warrant a conviction, unless there be, also, independent evidence to establish the *corpus delicti. Weller v. State,* 150 Md. 278, 284, 132 A. 624; *Bollinger v. State, supra; Williams v. State,* 214 Md. 143, 132 A. 2d 605. However, it is not necessary that the evidence independent of the confession be full and complete or that it establish the truth of the *corpus delicti* either beyond a reasonable doubt or by a preponderance of proof. *Wood v. State,* 192 Md. 643, 650, 65 A. 2d 316; *Davis v. State,* 202 Md. 463, 97 A. 2d 303; *Hall v. State,* 213 Md. 369, 375, 131 A. 2d 710; *Bollinger v. State, supra; Forte v. United*

*States,* 68 App. D.C. 111, 94 F. 2d 236; *Daeche v. United States,* 250 F. 566 (C.C.A., 2nd); *United States v. Washington,* 69 F. Supp. 143 (D.C., Md.); 7 Wigmore, *Evidence,* 3rd Ed., § 2071; Note, *Proof of the Corpus Delicti Aliunde the Defendant's Confession,* 103 U. Pa. L. Rev. 638. It is also well settled that the *corpus delicti* may be proved by circumstantial evidence. *Jones v. State,* 188 Md. 263, 52 A. 2d 484; *Davis v. State, supra.* The *quantum* of independent proof of the *corpus delicti* is to be determined by the circumstances of each particular case. *Wood v. State, supra; United States v. Washington, supra.* The difficulty of obtaining much independent proof of the *corpus delicti* in arson cases was noted in *Bollinger v. State, supra.* Here the death of the victim of the attack has greatly reduced the possible amount of evidence which is usually available in cases of this type.

We do have, however, clear evidence of a violent assault and we have evidence of the circumstances of the attack from which, as we have noted, an intent on the part of the defendant may be deduced. Under these circumstances, we think that the evidence as to the *corpus delicti* was sufficient to warrant the admission into evidence of the defendant's confession (or statement in the nature of a confession) at the time when it was offered, which was towards the close of the State's case. It was offered through the State's last witness. Cf. *Cooper v. State,* 205 Md. 162, 106 A. 2d 129.

Once such a statement is properly admitted, the question as to the sufficiency of the evidence to establish guilt is to be determined by considering both the confession and other evidence of the *corpus delicti. Jones v. State; Davis v. State; Bollinger v. State,* all cited above. In the latter case (208 Md. at 306), this Court quoted with approval the following statement from *Ercoli v. United States,* 131 F. 2d 354 (C.A., D.C.): "It is sufficient if there is substantial evidence of the *corpus delicti,* independent of the confession and the two together are convincing beyond a reasonable doubt." Applying this rule to the facts of this case, and without laboring a restatement of them, we think that the evidence was sufficient to sustain the trial judge's finding. The defendant's statement furnishes substantial evidence as to the purpose for which he

entered the house and sought admission to what proved to be Mrs. Malone's apartment, and we think that the trier of the facts could have fairly concluded beyond a reasonable doubt that the defendant had not abandoned his purpose, that he intended to use force to carry it out, and that this was the reason for the violent assault which he undoubtedly committed against Mrs. Malone. The question is not whether we *might* have reached a different conclusion from that of the trial court, but whether the trial court had before it sufficient evidence upon which it could fairly be convinced beyond a reasonable doubt of the defendant's guilt of the offense charged; and the verdict of the trial court is not to be set aside on the evidence unless clearly erroneous. Rule 741 c of the Maryland Rules; *Lambert v. State,* 196 Md. 57, 75 A. 2d 327; *Edwards v. State,* 198 Md. 132, (on motion for reargument) 152, 81 A. 2d 631, (on motion for reargument) 83 A. 2d 578; *Shelton v. State,* 198 Md. 405, 84 A. 2d 76; *Estep v. State,* 199 Md. 308, 86 A. 2d 470; *Cooper v. State,* 205 Md. 162, 106 A. 2d 129; *Floyd v. State,* 205 Md. 573, 109 A. 2d 729; *Basoff v. State,* 208 Md. 643, 119 A. 2d 917; *Coleman v. State,* 209 Md. 379, 121 A. 2d 254; *Clay v. State,* 211 Md. 577, 128 A. 2d 634; *Kier v. State, supra; Shockley v. State, supra.* In a colloquy preceding final argument of the case below, the trial judge expressed the view that on the testimony as presented the case was a close one. We agree with that view, but we are not prepared to say that, on the evidence, his verdict was clearly erroneous. Therefore, in accordance with Rule 741 c the judgment will be affirmed.

*Judgment affirmed.*