556 A.2d 236

**Michael Gregory WOODS**

v.

**STATE of Maryland.**

**No. 98, Sept. Term, 1988.**

Court of Appeals of Maryland.

April 10, 1989.

**594**

Clarence W. Sharp, Asst. Public Defender (Alan H. Murrell, Public Defender, both on brief), Baltimore, for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for appellee.

Argued before ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals of Maryland (Retired) Specially Assigned.

CHARLES E. ORTH, Jr., Retired Specially Assigned Judge.

A saga of revenge and murder for hire unfolds on this appeal. The principals are:

Michael Kevin Boyd, the victim, and abuser of his wife,

Jody Boyd, who offered a contract for the murder of her husband to

Michael Gregory Woods, who accepted the contract and assembled a hit team consisting of

Donald Dare, and

James Hayes, a youth 15 years of age, who turned State's witness.

Jody Boyd decided that the best solution to her marital problems, marked by physical abuse inflicted by her husband, was to have him killed. She asked Woods to do the job, offering to pay him for his services out of monies she expected to receive upon her husband's death. After mulling over the proposition, Woods agreed to perform the murder on the terms offered. He sought and obtained the assistance of Dare and Hayes. Time went by with nothing being done because the team could not settle upon the best way to fulfill the agreement. Under pressure from Jody "to complete the job," the team "came up with the idea to blow [the husband's] car up with dynamite," but "this attempt failed."[1] The team "decided that the only for sure way to get rid of [the husband] was to shoot him." They got a gun "suitable for the job" from Dare's house and then "had to think of a way to shoot [the husband]." At first, they were going to shoot him when he arrived home from work, but "cancelled that plan" because "[t]here was too much daylight out." Woods and Dare contacted Jody to get her thoughts on the matter. At her suggestion, arrangements were made to set the husband up by her persuading him to leave the couple's apartment at 10:00 p.m. on a certain day to fetch something to eat from a fast-food store. The team went to the Boyds' apartment complex on the agreed day shortly before the designated time. The husband left the apartment about 10:00 p.m. as planned. Woods hid next to a truck that was parked near the

---

1. Quotations in our narrative of events are from the statement given by Woods to the police.

husband's car. Dare hid nearby. Woods recounted the succeeding events:

I then had to wait for him to come back. He came back approximately twenty minutes later. He got out of his car and started walking towards the building. He walked about ten yards towards the building, which brought him full view where I could see him. He was approximately fifteen yards away when I fired. Hoping I was doing the right thing for Jody's situation, I aimed the gun at him and squeezed the trigger a few times.

Woods ran back to Dare's car in which the team had been driven by Dare to the murder scene. On the way Woods heard the husband scream. Hayes was to have the car "running and waiting for us." Dare had already arrived back at the car. Dare drove the team to Woods' house to "change and wash up." They decided "the best thing to do was to burn our clothes." The next day Woods burned his clothes.

The husband died. The cause of death was four gunshot wounds. Although in his statement to the police Woods said that he threw the gun into the Magothy River, a .32 caliber automatic handgun, recovered from Woods' home, proved to be the weapon that fired the bullets that killed Michael Kevin Boyd.

Woods was charged with the murder of Michael Kevin Boyd and with a spate of offenses related to the homicide and his contract with Jody Boyd. The case came up for trial in the Circuit Court for Anne Arundel County. Woods opted not to be tried by a jury and placed his fate in the hands of the judge. The judge found him guilty of murder in the first degree (count 1 of the indictment); attempted murder (count 4); conspiracy to dynamite an automobile (count 6); and using a handgun in the commission of the felony of murder (count 7). The following sentences were imposed:

1st count—"to the term of [his] natural life without parole";

4th count—"to a concurrent life term";

6th count—to a "period of one year concurrent";

7th count—"to a period of five years ... consecutive to the first count."

## I

Woods claims that the sentence of life imprisonment without parole is illegal.

### (A)

The State suggests that the matter of the illegality of the sentence was not preserved for appellate review because Woods did not object when it was imposed. Md.Rule 8–131. We said in *Walczak v. State*, 302 Md. 422, 488 A.2d 949 (1985), that

when the trial court has allegedly imposed a sentence not permitted by law, the issue should ordinarily be reviewed on direct appeal even if no objection was made in the trial court. Such review and correction of an illegal sentence is especially appropriate in light of the fact that Rule 4–345(a) ... provides that "[t]he court may correct an illegal sentence at any time."

*Id.* at 427, 488 A.2d 949. We see no sound reason why we should not review the illegality of the sentence on this appeal.

### (B)

The State did not seek to have Woods executed. But it did want him imprisoned for life without the possibility of parole. It so notified him. As we have seen, the State obtained what it sought.

### (1)

■ Woods urges that the legislature intended that a sentence of life without parole may be imposed only upon the sentencing proceedings set out in Maryland Code (1957, 1987 Repl.Vol., 1988 Cum.Supp.), Art. 27, § 413. The key to legislative "intent" is the purpose of the legislation, determined in the light of the statute's language and context. *Kaczorowski v. City of Baltimore*, 309 Md. 505, 516, 525

A.2d 628 (1987). The legislative scheme shines bright and clear from the plain and unambiguous language of §§ 412 and 413 of Art. 27 and Maryland Rules 4-341 and 4-342 adopted to implement them as authorized by Art. 27, § 413(*l*), as illuminated by the legislative history of the statute. Review of these materials makes plain that the legislative intent was not what Woods would have it be.

 One of three sentences is authorized upon conviction of murder in the first degree:

1) death; or

2) imprisonment for life without the possibility of parole; or

3) imprisonment for life.

Maryland Code, Art. 27, § 412(b). *See* Md. Const., Art. III, § 60.[2] If the State seeks a harsher penalty than the basic imprisonment for life, it must so notify the defendant at least 30 days prior to trial. Art. 27, § 412(b). The notice may go only to the death penalty, or only to imprisonment for life without the possibility of parole, or to death and, in addition thereto, imprisonment without the possibility of parole. *Id.* If the State does not give notice that it is seeking a more severe penalty than life imprisonment, the court may proceed to sentence as it generally does in imposing a penalty authorized upon conviction of any other offense, except for mandatory sentences for crimes of violence as prescribed by Art. 27, § 643B or other statutes. When, however, the State gives notice that it is seeking a harsher sentence than life imprisonment, there must be a separate sentencing proceeding. If the notice goes only to life imprisonment without the possibility of parole, the separate sentencing proceeding is before the court—a jury is not involved. Maryland Rule 4-342(b) provides:

---

**2.** Maryland Const., Art. III, § 60 gives the General Assembly
the power to provide by suitable enactment ... for the release upon parole in whatever manner the General Assembly may prescribe, of convicts imprisoned under sentence for crimes.
It follows that the General Assembly may forbid release upon parole.

When a defendant has been found guilty of murder in the first degree and the State has given timely notice of intention to seek a sentence of imprisonment for life without the possibility of parole, but has not given notice of intention to seek the death penalty, the court shall conduct a separate sentencing proceeding as soon as practicable after the trial to determine whether to impose a sentence of imprisonment for life or imprisonment for life without parole.

This is in accord with Art. 27, § 413(k)(5) and (8).[3]

When a defendant has been found guilty of murder in the first degree and the State has given the required notice that a sentence of death is sought (be it the only sentence sought or be it sought in conjunction with a sentence of imprisonment for life without parole) so that the defendant may be subject to a sentence of death, the separate sentencing proceeding is much more elaborate. *See* Maryland Rule 4–343. The proceeding shall be conducted before a jury unless a jury sentencing is waived by the defendant. Art. 27, § 413(b). Detailed prescriptions are set out in Art. 27, § 413 concerning evidence, argument and instructions, paragraph (c); consideration of aggravating circumstances (d); definitions (e); a finding that no aggravating circumstances exist (f); consideration of mitigating circumstances (g); weighing mitigating and aggravating circumstances (h); the determination of the sentence (i); the statements required in the determination (j); and the imposition of the sentence (k). *See* Md.Rule 4–343(e).

It is obvious that the legislature established two separate and distinct procedures for sentencing when a person is convicted of murder in the first degree—one when the person is subject to the death penalty and the other when he is not subject to execution but is subject to incarceration for life without parole. The former procedure calls for the

---

**3.** Subparagraph (8) of Maryland Code (1957, 1987 Repl.Vol., 1988 Cum.Supp.), Art. 27, § 413(k) was added by Acts 1988, ch. 418. It seems that it merely repeats the substance of subparagraph (5).

proceedings set out in such fine detail and a jury unless a jury is waived. The latter procedure is in the sound discretion of the trial judge. All references in Art. 27, § 413 to the elaborate proceedings are in the frame of reference of the death penalty. *See,* for example, paragraph (a); paragraph (c)(2); paragraph (f); paragraph (h)(2) and (3); and paragraph (k)(1), (2), (3), (4), and (6).

The legislative history of H.B. 693, which was enacted as Acts 1987, ch. 237 and codified as Art. 27, §§ 412 and 413 supports our reading of the statutory text. The bill added imprisonment for life without the possibility of parole as a penalty for first degree murder. It was "a compromise bill" favored by support from prosecutors, the Public Defender, and others. *See* Senate Judicial Proceeding Committee, Summary of Committee Report from the Committee Report System of the Department of Legislative Reference, 1987 General Assembly of Maryland at 3. The Report, over the signature of the Committee Chairman, observed:

Life imprisonment without the possibility of parole is needed as a sentencing option in first degree murder cases because there are people committing heinous crimes; for example, serial killers, who are not eligible for the death penalty. In addition, a death penalty proceeding is a long, expensive process and a tremendous drain on resources. Life without parole would be less costly and would have the effect of preventing the defendant from killing again.

*Id. See also* the "Bill Analysis" of H.B. 693 submitted by the Department of Legislative Reference to the Senate Judicial Proceedings Committee. It is perfectly apparent that the legislature did not intend that the sentencing scheme of § 413 be utilized with respect to a sentence of life without parole. The contention of Woods to the contrary is without merit.

(2)

Woods declares that if the proceedings called for by § 413 do not apply to a sentence of life without parole, then

the sentence is unconstitutional. At this point his argument becomes rather difficult to follow. He concedes that his contention is not one "claiming that the penalty of life imprisonment for first degree murder without parole is, in and of itself, a constitutionally impermissible cruel and unusual punishment." He states:

Such is not the case for certainly, if the sentence of death is constitutionally permissible when suitably directed, limited and guided by objective consideration of both the offense and the offender, then a sentence of life imprisonment without parole would be constitutionally permissible if similarly imposed.

He explains that his

point is that, in this case, where the State gave notice of intent to seek the sentence of life without parole and no other, the statute's silence on the matter of direction, limitation and guidance in the request for and imposition of this sentence renders the sentence and the statutory authorization of the sentence constitutionally impermissible.

He seeks to apply to a life sentence without parole the reasoning of cases which have held the death penalty to be unconstitutional. "In short," he states,

the constitutional challenge in this appeal is limited to the factual setting of this case. We are not addressing the imposition of the sentence of life imprisonment without parole when the State seeks the sentence as part of an alternative to the death penalty and a full death penalty sentencing hearing is held.

He continues:

Nor does this appeal address the issue of imposition of the sentence of life imprisonment without the possibility of parole in such a case on the basis of any procedural infirmity or a proportionality analysis.

The essence of Wood's complaint seems to be that when, as here, a life sentence without parole is imposed without following the procedures required for a sentence of death, it

is unconstitutionally void for vagueness [4] as offending due process of law. If it violates due process of law, Woods appears to reason it is cruel and unusual punishment.[5]

As best we can understand Woods' argument, he believes that the legislative scheme for the imposition of a life sentence without parole is vague because it is "ambiguous" or "arbitrary." It is "ambiguous" or "arbitrary" because it lacks the guidelines provided for the death penalty. He avers that

> when notified of the State's intent to seek the sentence of life imprisonment without the possibility of parole, [he] had to guess at the sentencing procedures if he was convicted of the crime of first degree murder.

That, of course, is simply not so. Although limited here to a choice between life imprisonment or life imprisonment without parole, the judge otherwise would be guided by the same consideration and restrictions as in the imposition of any sentence other than the death penalty or a sentence required to be mandatory. The discretion a judge may exercise in sentencing has long been firmly established and consistently applied. In the absence of statutory mandates, "[n]othing in the law requires that Guidelines sentences or principles be applied; they complement rather than replace the exercise of discretion by the trial judge." *Teasley v. State*, 298 Md. 364, 370, 470 A.2d 337 (1984). We laid it all

---

**4.** Woods recognizes that the vagueness doctrine "usually turns on the statute's definition of criminal conduct," that is, whether "the statutory language does not give fair notice or inform the citizen of those acts or conduct which are forbidden." He concedes that this is not the concern here. But without the citation of persuasive authority, he would have the doctrine extended to cover the lack of statutory specificity as to sentencing procedures in the judge's determination whether to incarcerate a defendant for life with no eligibility for parole.

**5.** "[C]ruel and unusual punishments [shall not be] inflicted." U.S. Const. amend. VIII.
 We the People of the State of Maryland ... declare ... That ... cruel or unusual punishment [shall not be] inflicted, by the Courts of Law.
Md. Dec. of Rights, Art. 25.

out in *Smith v. State,* 308 Md. 162, 517 A.2d 1081 (1986). We noted in *Smith* that "a sentencing judge is vested with virtually boundless discretion." *Id.,* 308 Md. at 166, 517 A.2d 1081, quoting *Logan v. State,* 289 Md. 460, 480, 425 A.2d 632 (1981). We explained:

> The sentencing judge is accorded this broad latitude to best accomplish the objectives of sentencing—punishment, deterrence and rehabilitation. A sentence should be premised upon both the facts and circumstances of the crime itself and the background of the individual convicted of committing the crime. The strict rules of evidence do not apply at a sentencing proceeding....

*Smith,* 308 Md. at 166, 517 A.2d 1081 (citations omitted). We looked to *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949):

> "A sentencing judge ... is not confined to the narrow issue of guilt. His task within fixed statutory or constitutional limits is to determine the type and extent of punishment after the issue of guilt has been determined. Highly relevant—if not essential—to his selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial."

*Smith,* 308 Md. at 167, 517 A.2d 1081, quoting *Williams,* 337 U.S. at 247, 69 S.Ct. at 1083. We cautioned, however:

> There are, of course, some restrictions placed upon the judge presiding at the sentencing proceeding. A sentence cannot violate any constitutional requirements such as the prohibition against cruel and unusual punishment; the sentencing judge cannot be motivated by prejudice, ill-will or any other impermissible considerations; and the sentence itself cannot exceed any limitation set by statute. In addition to these limitations, the prosecution

must disclose to the defendant or counsel any information the State plans to present before the judge for consideration in sentencing. Such notice affords a defendant the opportunity to refute or discredit this information.

*Id.*, at 169–170, 517 A.2d 1081 (citations omitted). *See Reid v. State,* 302 Md. 811, 490 A.2d 1289 (1985). The legislature may, of course, circumscribe the judge's discretion as it has done with respect to the death penalty. But the plain and unambiguous language of Art. 27, §§ 412 and 413 and Maryland Rules 4–341 and 4–342 leave no doubt that the legislature intended that the imposition of a life sentence without parole shall remain under traditional sentencing procedures. This scheme does not offend the federal Constitution, and the Maryland Constitution bestows upon the General Assembly the power over parole "in whatever manner the General Assembly may prescribe." *See* note 2, *supra.*

### (3)

■ Woods contends: "It is entirely appropriate to look to the death penalty cases in the Supreme Court to determine the constitutionality of the Maryland statute...." Woods relies on the Supreme Court's analysis of death penalty statutes but he asks this Court to ignore the basis of the Supreme Court's decisions. In *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972),[6] the justices clearly were compelled by the "uniquely and unusually severe punishment" of death. 408 U.S. at 305, 92 S.Ct. at 2760 (Brennan, J., concurring). Justice Stewart in his concurrence expressed the fundamental distinction:

The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic pur-

---

**6.** Justice Douglas, Justice Brennan, Justice Stewart, Justice White, and Justice Marshall filed separate opinions in support of the judgments. Chief Judge Burger, Justice Blackmun, Justice Powell, and Justice Rehnquist filed separate dissenting opinions.

pose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity.

*Furman,* 408 U.S. at 306, 92 S.Ct. at 2760. *See State v. Davis,* 310 Md. 611, 624–625, 530 A.2d 1223 (1987), quoting Justice Brennan dissenting in *Hutto v. Davis,* 454 U.S. 370, 373, 102 S.Ct. 703, 705, 70 L.Ed.2d 556 (1982).

In essence, Woods argues that a life sentence without the possibility of parole is relatively the equivalent of death itself. The Supreme Court in *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976), again drew the distinction:

> Death, in its finality, differs more from life imprisonment than a 100 year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Woodson,* 428 U.S. at 305, 96 S.Ct. at 2991. Furthermore, we observe that the Governor, upon due notice

> may pardon any person, convicted of crime, on such conditions as he may prescribe, or he may upon like notice remit any part of the time for which any person may be sentenced to imprisonment on such like conditions without such remission operating as a full pardon to any such person.

Maryland Code (1957, 1986 Repl.Vol., 1988 Cum.Supp.), Art. 41, § 4–513. *See* § 4–516(b)(3)(ii) and § 4–514. But,

> [i]f eligible for parole ... an inmate serving a term of life imprisonment ... shall only be paroled with the approval of the Governor.

Code, Art. 41, § 4–516(b)(4). We note that the Governor may, upon due notice, "commute or change any sentence of death into penal confinement for such period as he shall think expedient." Art. 41, § 4–513. *See* Md. Const., Art. II, § 20. But, of course, once a person has been executed, he is beyond the mercy of the Governor. We do not agree

with the notion that a life sentence without the possibility of parole is, even relatively, the equivalent of death itself. The death penalty cases cited by Woods to support this view are simply inapposite.

(4)

■ At the penalty stage of the trial, the court conducted a separate sentencing proceeding. The judge had before him "a packet of documents." Included in the packet were a booklet showing Woods' participation "in a ministry program at the Anne Arundel Detention Center while he [was] incarcerated there," and "two letters of recommendation or character-type references from officers at the . . . Detention Center on behalf of Mr. Woods." The judge also had, and considered, a presentence investigation report from the Department of Parole and Probation, a letter from the Reverend Gerald Kurek of St. Mary's Church "with regard to his involvement" with Woods, and a number of "individual character reference letters from friends and acquaintances" of Woods, "[a]ll of which speak very highly" of him. Defense counsel submitted two psychological reports of examinations made of Woods which tended to explain his actions. Woods' father (who was subjected to vigorous cross-examination) and his mother testified under oath on behalf of their son, as did the minister of Lake Shore Baptist Church. Woods personally and through counsel made a statement and presented information in mitigation of punishment pursuant to Maryland Rule 4-342(e). The prosecutor was heard. It is apparent that there was a plenary hearing separately conducted by the court on the matter of the sentence to be imposed.

We conclude that the sentence of life imprisonment without parole imposed on the conviction of Woods for murder in the first degree did not offend the Constitution of the United States or the Constitution of Maryland. It neither denied him due process of law nor subjected him to cruel and unusual punishment. All the required procedures were followed by the court in imposing the sentence. The sen-

tence is in accord with legislative enactments and the rules adopted by this Court. It is not contrary to the case law of this State. In short, the sentence of life imprisonment without possibility of parole imposed on Woods was legal.

## II

Woods next attacks all of the judgments entered against him. The basis of his challenge is that the court erred in denying his motion to suppress evidence.[7] At the hearing on the motion, defense counsel limited the allegation of error to the matter of probable cause for Woods' arrest.

A detective of the Anne Arundel County Police Department, assigned to the Homicide Division, and designated as "the primary investigator" of Boyd's homicide, testified as to the circumstances leading to the arrest of Woods. He was told by Mrs. Sherry Rutherford that she had overheard a conversation before the murder between Woods, Dare, and Jody Boyd "in reference to a quote unquote getting rid of her husband, Michael Boyd." She gave the detective a description of Woods and informed him that Woods was an old boyfriend of a girl named Michele Madden. The detective located Madden and one Greta Kemp who was a half-sister of Dare. Madden told him that before the murder she overheard Woods and Dare speaking with Jody Boyd "with reference to having [Jody's] husband being taken care of—gotten rid of." Madden also reported that Woods told Jody: "[H]e would take care of it."

He didn't know how he was going to do it, but he would do this for Jody.

Thereafter, before the murder, Woods called Madden to get Jody's telephone number so he could contact Jody. Madden

---

7. Prior to trial Woods timely filed an "Omnibus Motion Pursuant to Rule 4–252 Maryland Rules of Procedure." The motion included requests for the suppression of "all evidence seized from [him] at the time of [his] arrest," of "all evidence which was unlawfully seized by police officers or their agents in their search of premises or a motor vehicle in connection with this alleged offense," and of "all admissions, statements or confessions" obtained by the police from Woods.

told the detective that after the murder she and Kemp saw Woods and Dare who asked "if they ... had seen the newspaper articles related to this killing over in Glen Mar Apartments (the scene of Michael Boyd's murder)." The detective was informed by Kemp that

[s]he had heard from Michael Woods and from Donald Dare that [Woods] had in fact shot Michael Boyd. He had also made comments that beforehand that he planned on assisting Jody Boyd by killing her husband for her, using the word—the terms "getting rid of" and things of that nature.

The detective obtained Woods' address from the Motor Vehicle Administration. Greta Kemp resided with Dare and his mother and stepfather, the parents of Greta. Mr. Kemp phoned the detective after the police had interviewed Greta and told the detective that

he was missing a gun from his house, a thirty-two automatic from his closet and some other items, ammunition belonging to that gun.

In response to the phone call, the detective went to the Kemp residence "and obtained all the information about the missing weapon and the other missing items." Mr. Kemp told the police that Woods and Dare were together in Dare's car "an older model, dark blue Pinto hatchback." Efforts made to obtain the tag number from the Motor Vehicle Administration were unsuccessful "because apparently it wasn't registered under the make of that car." The detective informed the hearing judge that the cause of Michael Boyd's death was four gunshot wounds from a small caliber weapon. The police placed Woods' residence under surveillance. The officers assigned to the stakeout were told "to look for a dark blue older model hatchback Pinto, tag unknown," that Dare and Woods were together, and that Dare was expected "to drop Woods off at this location using this blue Pinto." They were given the description of Woods. A short time later the detective was informed by the stakeout officers that they saw a man answering the description of Woods getting into a dark blue Pinto in front

of Woods' house. The detective and the other officers followed the car and, "with the assistance of the uniformed division," had the car pull over to the side of the road. There were four occupants in the car.[8] "[T]hey were all searched for officer protection." A .22 caliber semi-automatic handgun was recovered from Woods' rear pocket. The detective told Woods that he was under arrest, and he was taken to the Criminal Investigation Division in Crownsville. Defense counsel submitted. He argued that the police should have obtained a warrant, but upon inquiry by the court he conceded that it did not matter that the police could have gotten a warrant but did not get one. He said: "I had to make that argument for the record." The judge said:

> We've got oodles of evidence that a Michael Woods made the statements that he made and then we have the police finding a Michael Woods whose description meets the description given in an address not far from the scene, though Pasadena is an awful big place. And we have a person meeting the description of Michael Woods ... entering a vehicle next to or near the home of Michael Woods or the address of Michael Woods and the vehicle happens to be a vehicle which is the same description except for the tag that isn't actually the same vehicle involved. I think it's enough for probable cause.

We agree.

The evidence Woods sought to suppress was obtained by the police after his arrest—a confession made upon a custodial interrogation, and the murder weapon, seized upon a warrantless search of his residence. As we pointed out *supra*, at the suppression hearing defense counsel limited the grounds for his motion to suppress this evidence to the

---

8. It turned out that the car the police stopped was not Dare's "old blue Pinto hatchback" but another "blue Pinto hatchback." As we have seen, the police did not have the tag number of Dare's car. After the arrest of Woods and a consent search of the car, the other three occupants were permitted to go on their way.

contention that the police lacked probable cause for Woods' arrest. Woods puts it this way in his brief:

> [I]f the arrest was found to be invalid the later statement and seizure would be inadmissible and if the arrest was found to be validly effectuated then the pretrial motion to suppress would be denied.

Maryland Code, Art. 27, § 594B(c) provides:

> A police officer may arrest a person without a warrant if the officer has probable cause to believe that a felony has been committed or attempted and that such person has committed or attempted to commit a felony whether or not in the officer's presence or view.

The statute is declarative of common law rules of arrest without a warrant. *Stevenson v. State,* 43 Md.App. 120, 127, 403 A.2d 812 (1979), *aff'd,* 287 Md. 504, 413 A.2d 1340 (1980).

> As a general rule, whether an arrest for a felony without a warrant is constitutionally valid necessarily turns upon whether, at the moment the arrest was made, the arresting officer or the police acting as a team had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the accused had committed or was committing a felony.

*Nilson v. State,* 272 Md. 179, 184, 321 A.2d 301 (1974).

> The rule of probable cause is a nontechnical conception of a reasonable ground for belief of guilt, requiring less evidence for such belief than would justify a conviction, but more evidence than that which would arouse a mere suspicion.

*Id.* We discussed the test for probable cause recently in *Malcolm v. State,* 314 Md. 221, 550 A.2d 670 (1988). Judge Blackwell, writing for the Court, observed that probable cause based on an informant's tip was no longer to be tested by the two-pronged analysis enunciated in *Aquilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

*Malcolm,* 314 Md. at 227–228, 550 A.2d 670. The Court held that the existence of probable cause, vel non, is better determined by a balancing test, *id.* at 229, 550 A.2d 670, that is, upon consideration of the totality of the circumstances, *id.* at 230, 550 A.2d 670.

■ It requires no extensive analysis of the totality of the circumstances to ascertain that at the moment Woods was arrested the facts and circumstances within the knowledge of the police and of which they had reasonably trustworthy information were much more than sufficient to warrant a prudent man in believing that Woods had committed a felony. The police knew that a felonious homicide had been committed—they saw Michael Boyd's bullet riddled body. We have heretofore recounted the information the police received from several reliable sources as to Woods' statements, both before and after the murder, which implicated him in the killing. The existence of probable cause to believe that Woods committed the murder was simply overwhelming. There is no doubt that the warrantless arrest of Woods by the police, armed with this probable cause, was valid. We hold that the trial judge did not err in denying the motion to suppress.

### III

■ At the point in the guilt stage of the trial when the State offered Woods' confession into evidence, defense counsel objected to its admission. The confession executed by Woods contained "Advisement of Rights," one of which was:

> You have the right to be taken without unnecessary delay, and in no event later than twenty-four (24) hours after arrest, before a Judicial Officer. . . .

Woods indicated in the confession that he understood this right. But he answered "no" to the question "Do you waive your right to be taken promptly before a Judicial Officer and agree to delay your appearance before him?" After evidence was received on the objection and argument made by counsel, the judge overruled the objection. On

appeal Woods claims that the denial was erroneous and that the confession and a gun recovered through information in the confession should have been suppressed.

Maryland Rule 4–212(e) includes the provision:

The defendant shall be taken before a judicial officer of the District Court without unnecessary delay and in no event later than 24 hours after arrest. . . .

It was brought out when the objection was being heard that the elapsed time from Woods' arrest to his appearance before a judicial officer was eight and one-half hours. The State accounts for this time as follows:

Woods was originally arrested at approximately 1:30 a.m. on July 4, 1987. He was taken to the police Criminal Investigations Division in Crownsville, where he arrived at approximately 2:10 a.m. He was advised of his rights at approximately 2:37 a.m. Upon being advised of his rights, Woods agreed to speak to the officers without the presence of an attorney. He gave an oral statement, which was then transferred into typewritten form. The oral statement lasted from 2:37 a.m. until 3:30 a.m. The typewritten statement started at 3:30 a.m. and ended at 5:07 a.m. Woods was ultimately transported to the Eastern District station at 8:00 a.m., and was ultimately taken before a commissioner at 10:00 a.m.

By Acts 1981, ch. 577, codified in the Maryland Code (1973, 1984 Repl.Vol.), as § 10–912 of the Courts and Judicial Proceedings Article, the legislature declared:

(a) *Confession not rendered inadmissible.*—A confession may not be excluded from evidence solely because the defendant was not taken before a judicial officer after arrest within any time period specified by the Maryland District Rules.

(b) *Effect of failure to comply strictly with Maryland District Rules.*—Failure to strictly comply with the provisions of the Maryland District Rules pertaining to taking a defendant before a judicial officer after arrest is only one factor, among others, to be considered by the court in

deciding the voluntariness and admissibility of a confession.

Acts 1981, ch. 577 was the legislative reaction to our decision in *Johnson v. State*, 282 Md. 314, 384 A.2d 709 (1978). In that case a majority of the Court held that a statement, voluntary or otherwise, obtained in violation of Md.Rule M.D.R. 723(a) (now Rule 4-212(e)) is subject to exclusion. 282 Md. at 328-329.[9] Woods looks to *Johnson* and brushes off CJ § 10-912. Here, however, there was no basis for a determination that the confession was involuntary. There is no sound reason why the confession was otherwise inadmissible, either under the *Miranda* dictates or the concept of traditional voluntariness. We hold that the court did not err in overruling the objection.

## IV

Woods mounts challenges to the judgments against him founded on the sufficiency of the evidence.

The test for the sufficiency of the evidence is whether the evidence either shows directly or supports a rational inference of the facts to be proved, from which the trier of fact could properly be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged. *Wilson v. State*, 261 Md. 551, 563-564, 276 A.2d 214 (1971).

### (A)

We shall not follow the circuitous route taken by Woods in arguing that the evidence was not sufficient to sustain the convictions. We shall resolve the issue, of course, in the light of the firmly established law of this State.

When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and

---

**9.** Even before the enactment of the statute, however, we held that transferring an oral confession into a writing was a legitimate reason to delay presentment of a defendant before a judicial officer. *Lewis v. State*, 285 Md. 705, 718, 404 A.2d 1073 (1979).

will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

Maryland Rule 8–131(c). But we are not restricted to any particular reasons or arguments that may have been advanced by the trial court, or by the State, or the defendant below, or on appeal. *Cranford v. State*, 36 Md.App. 393, 402, 373 A.2d 984 (1977).

 The extrajudicial confession given by Woods to the police, standing alone, was sufficient to establish the corpus delicti and Woods' criminal agency as to each of the crimes of which he was convicted. Likewise, the testimony of Hayes,[10] standing alone, was sufficient to establish the corpus delicti and Woods' criminal agency as to each of the crimes of which he was convicted. Both the confession and the testimony of Hayes, however, standing alone, lack a requirement necessary to warrant a conviction. Each of them must, in some measure, be corroborated.

### (1)

 We said in *Bradbury v. State*, 233 Md. 421, 424, 197 A.2d 126 (1964);

[i]t is, of course, well settled that an extrajudicial confession of guilt by a person accused of crime, unsupported by other evidence, is not sufficient to warrant a conviction.

We explained:

We have therefore consistently held that the extrajudicial confession must be supported by evidence, independent of the confession, which relates to and tends to establish the

---

10. Woods asserts that Hayes was an accomplice. The State suggests that he was not.

An accomplice is one who knowingly, voluntarily, and with common interest with the principal offender, participates in the commission of a crime either as a principal or as accessory before the fact.

*Watson v. State*, 208 Md. 210, 217, 117 A.2d 549 (1955). We assume for the purpose of decision in this case that Hayes was an accomplice.

*corpus delicti, i.e.,* the facts that are necessary to show that a crime has been committed.

*Id. See Cooper v. State,* 220 Md. 183, 190, 152 A.2d 120 (1959); *Jones v. State,* 188 Md. 263, 271–272, 52 A.2d 484 (1947); *Weller v. State,* 150 Md. 278, 284–285, 132 A. 624 (1926).

However, it is not necessary that the evidence independent of the confession be full and complete or that it establish the truth of the corpus delicti beyond a reasonable doubt or by a preponderance of proof.

*Cooper,* 220 Md. at 190, 152 A.2d 120. The supporting evidence may be small in amount and is sufficient to establish the corpus delicti

if when considered in connection with the confession or admission, it satisfies the trier of facts beyond a reasonable doubt that the offense charged was committed and that the accused committed it.

*Bradbury,* 233 Md. at 424–425, 197 A.2d 126. The corpus delicti may be proved by circumstantial evidence. *Cooper,* 220 Md. at 191, 152 A.2d 120. "The *quantum* of independent proof of the *corpus delicti* is to be determined by the circumstances of each particular case." *Id.* The accused's identity or criminal agency is not a necessary element of the corroboration required to make a confession admissible. *Weller,* 150 Md. at 284, 132 A. 624.

(2)

In *Luery v. State,* 116 Md. 284, 292–293, 81 A. 681 (1911), we departed from the common law and formulated the rule that a conviction may not rest on the uncorroborated testimony of an accomplice. We have steadfastly adhered to that rule despite pleas that we abandon it. *See Watson v. State,* 208 Md. 210, 117 A.2d 549 (1955); *Brown v. State,* 281 Md. 241, 378 A.2d 1104 (1977).

Not much in the way of evidence corroborative of the accomplice's testimony has been required by our cases. We have, however, consistently held the view that while the corroborative evidence need not be sufficient in itself

to convict, it must relate to material facts tending either (1) to identify the accused with the perpetrators of the crime or (2) to show the participation of the accused in the crime itself. If with some degree of cogency the corroborative evidence tends to establish either of these matters, the trier of fact may credit the accomplice's testimony even with respect to matters as to which no corroboration was adduced. That corroboration need not extend to every detail and indeed may even be circumstantial is also settled by our cases.

*Brown,* 281 Md. at 244, 378 A.2d 1104 (citations omitted).

### (B)

■■■ We first consider the murder conviction.

In a homicide case the proof of the *corpus delicti* is sufficient if it establishes the fact that the person for whose death the prosecution was instituted is dead, and that the death occurred under circumstances which indicate that it was caused criminally by someone.

*Jones,* 188 Md. at 272, 52 A.2d 484. In his confession Woods admitted that he shot Michael Boyd "three or four times" at point blank range in consummation of a plan to kill Boyd. This admission was corroborated as required with respect to the corpus delicti of murder in the first degree. Evidence apart from the confession established that Michael Boyd was indeed dead. His body was found. A doctor in the Department of Post Mortem Examiners testified that the cause of death was "the gunshot wounds." The gunshot wounds were enough to show that the manner of death was homicide—that Boyd's death was not by accident or suicide but was caused criminally by someone. With this corroboration the confession was enough to meet the test for the sufficiency of evidence to sustain the conviction of murder in the first degree.

### (C)

### (1)

■■■ We turn to the convictions of attempted murder and conspiracy to blow up a car with dynamite. Hayes

testified that Woods told him that Woods and Dare were going to blow up Michael Boyd's car with dynamite because Boyd's wife wanted him dead. He saw Jody Boyd give Woods a roll of wire "like a speaker wire." Woods said he "planned on using it to blow up the car.... He was gonna do the number one spark plug and try to spark the dynamite with it." Hayes said he saw the dynamite the night when Dare bought it from "a black guy." Woods and Hayes were present at the purchase. Hayes described the dynamite. Hayes saw the dynamite again several days later when "Mike [Woods] and Donnie [Dare] tried to blow up Michael Boyd's car one time," in the early morning at Boyd's apartment complex. Dare hid in the woods, and Woods went over to an automobile. Hayes did not see what Woods did, but he and Dare returned a short time later. Boyd came out of the apartment building, got in the car that Woods had approached, and drove away. Woods, Dare and Hayes followed him. Boyd drove to the National Security Agency, his place of work, parked, left the car and entered the building. The car in which Woods was riding was parked near Boyd's car. Woods got out and retrieved the dynamite from underneath the wheel well of Boyd's car. Hayes could see that the fuse in the dynamite had been lit—"it was burnt. It was black on the top of the fuse." "The fuse had been lit but it went out and [the cardboard around the dynamite] was wet." Later, Woods said that the dynamite" was the dynamite he'd tried to blow the car up with." Woods threw the dynamite away near an old drive-in movie at Fort Meade in Odenton.

The testimony of Hayes would be legally sufficient to sustain the convictions of attempted murder and conspiracy to dynamite an automobile if it were corroborated by evidence tending to show that Woods was a participant in the commission of the crimes. We believe that the necessary corroboration was supplied by Woods' confession. He stated therein that he, Dare and Hayes "came up with the idea to blow up [Michael Boyd's] car with dynamite" to kill Boyd. He added: "[T]his attempt failed."

In *Brown v. State*, 281 Md. at 246, 378 A.2d 1104, we observed that testimony from the defendant himself corroborated the testimony of an accomplice by tending to show that the defendant was either identified with the perpetrators of the crime or participated in the commission of the crime itself. In *Strong v. State*, 261 Md. 371, 275 A.2d 491 (1971), *vac. as to the death penalty*, 408 U.S. 939, 92 S.Ct. 2872, 33 L.Ed.2d 760 (1972), the defendant was convicted of the murder in the first degree of a cab driver. We found that the testimony of an accomplice implicating him in the murder "was fully corroborated by the testimony of two [third persons] that [the defendant] confessed to each of them that he had killed the cab driver...." *Strong*, 261 Md. at 377, 275 A.2d 491. In *Mulcahy v. State*, 221 Md. 413, 158 A.2d 80 (1960), we considered as part of the corroborative evidence the defendant's "own statement to the police immediately after his arrest" which tended to place him at the scene of the crime and to identify him with the perpetrators of the murder. *Mulcahy*, 221 Md. at 427–428, 158 A.2d 80. In *Judy v. State*, 218 Md. 168, 146 A.2d 29 (1958), we included as corroborative evidence the "words of the defendant himself." *Judy*, 218 Md. at 176, 146 A.2d 29. It may be that Woods' confession is not corroborated with respect to the attempted murder and the conspiracy to dynamite the car. But that would mean only that the confession could not serve to warrant convictions of those crimes. We are not relying on the confession to warrant the convictions. We look to it only to corroborate the testimony of the accomplice which is sufficient to warrant the convictions if corroborated. It is not disputed that the confession was freely and voluntarily made. There is no suggestion in *Strong*, *Mulcahy*, and *Judy* that admissions by the defendant to the police or to third parties had themselves to be corroborated in order to serve as corroboration of the testimony of an accomplice. And we think that it is immaterial whether the corroboration be by way of judicial admissions as in *Brown* or by way of voluntary extrajudicial admissions as were made here. We see no

reason why Woods' admissions to the police, first made orally and then reduced to writing, should not be so utilized.

(2)

Woods fits another arrow to his bow in his attempt to shoot down his convictions of attempted murder and conspiracy to dynamite an automobile. As to the former he seeks to invoke the doctrine of "factual impossibility," claiming that he could not be convicted of attempted murder because the means employed could not have caused death. As to the latter he contends that the explosive utilized was not shown to be dynamite.

(a)

In his testimony concerning the attempt to blow up Boyd's car, Hayes was shown an explosive and said that it looked like the "dynamite" retrieved by Woods from the underneath of Boyd's car. The explosive Hayes identified was a "quarter stick." A Deputy State Fire Marshall, accepted as an expert in the field of explosives, testified that a "quarter stick" could be a quarter of a stick of dynamite, or the street term for a lower explosive. Woods, on the premise that the explosive planted by him had to be capable of killing Boyd or inflicting grievous bodily harm upon him, declared that the testimony of the expert "affirmatively proved that it was not." A fair reading of the testimony belies this bald assertion. Of course, we do not know the exact nature of the explosive Woods employed, but we shall assume that it was the "lower type." Woods summarizes the expert's testimony:

> This had the capability, if exploded under a car, to blow out one of the tires or gas tank if placed there or to set fire to any oily residue or gas that might have accumulated under the car. It would not have the capability to kill someone unless it blew up the gas tank.

Clearly, in the face of this testimony, when Woods affixed the explosive to Boyd's car in such a way that, if things went as planned, it would explode while Boyd was driving, his death was indeed likely from a fire, or a gas tank

explosion, or loss of control of the vehicle. Certainly, the judgment of the trial judge that Woods attempted to murder Boyd was not clearly erroneous.[11]

(b)

Maryland Code, Art. 27, § 119 provides:

Every person, his aiders or abettors, who shall wilfully and maliciously dynamite, blow up or otherwise, by means of any explosives as that term is defined in § 26(a) [now (1)] of Article 38A of this Code, wreck, destroy, injure or damage, in whole or in part, or attempt so to do, or conspire or connive thereat, any property whether real or personal, public or private, shall be guilty of a felony, and shall be subject, in the discretion of the court, to imprisonment for life or for a definite period not exceeding twenty years, or to a fine not exceeding twenty thousand dollars, or to both fine and imprisonment, in the discretion of the court.

In his attempt to set aside his conviction of conspiracy to dynamite Boyd's car, Woods leans on the failure of the evidence to establish that the explosive he used in his abortive attempt was "dynamite." Explosives, as that term is used in Md.Code, Art. 38A, § 26(1),

---

**11.** We call attention to a statement by R. LaFave, *Criminal Law* § 6.3(a)(2) (1986) at 512:

> All courts are in agreement that what is usually referred to as "factual impossibility" is not defense to a charge of attempt. That is, if what the defendant intends to accomplish is proscribed by the criminal law, but he is unable to bring about that result because of some circumstances unknown to him when he was engaged in the attempt, then he may be convicted.

The Court of Special Appeals has followed this view. *In re Appeal No. 568, Term 1974,* 25 Md.App. 218, 220–223, 333 A.2d 649, *cert. denied,* 275 Md. 751 (1975); *Waters v. State,* 2 Md.App. 216, 226, 228, 234 A.2d 147 (1967), *cert. denied,* 259 Md. 737 (1970).

We have not decided the effect on culpability of impossibility to commit the intended crime. *Young v. State,* 303 Md. 298, 308 n. 6, 493 A.2d 352 (1985), and we need not now address it.

We note that the expert witness in the case before us testified that "[s]ome people on the street believe that quarter sticks are almost as powerful as a quarter stick of dynamite."

means gunpowder, powders for blasting, high "explosives" blasting materials, fuses (other than electric circuit breakers), detonators, and other detonating agents, smokeless powder and any chemical compound or any mechanical mixture containing any oxidizing and combustible units, or other ingredients in such proportions, quantities, or packing that ignition by fire, friction, concussion, percussion or detonation of any part thereof may and is intended to cause an explosion, including bombs and destructive devices designed to operate by chemical, mechanical or explosive action but shall not include fixed ammunition for small arms, small arms ammunition primers, small arms percussion caps, safety and pyrotechnic fuses, quills, quick and slow matches, friction primers, fireworks, or common matches when used in their original configuration.

The State recounts the evidence with respect to the nature of a "quarter stick":

The expert in this case testified that a quarter stick "is made up of potassium bicarbonate, aluminum powder, and ... and sulfur ... and functioned by a three-thirty seconds pyrotechnic fuse ... green or red." He stated that the quarter stick would detonate at approximately 1,000 feet per second. He also stated that anything over 180 grains of flashpowder is considered a Class A explosive under the definition in Article 38A, § 26. The size "quarter stick" identified by Hayes held over 200 grains of flashpowder.

The explosive answering the description given by Hayes which Woods used was clearly within the ambit of the statute under which he was charged. Woods' contention is devoid of merit.

### (D)

██ Lastly, we review the sufficiency of the evidence to sustain the handgun violation. Maryland Code, Art. 27, § 36B(d) makes it a misdemeanor for any person to "use a handgun or an antique firearm capable of being concealed

on the person in the commission of any felony...." The evidence showed that Boyd had been shot four times, and it was legally sufficient to establish that Woods was the criminal agent. A .32 auto caliber (7.65 mm) pistol with a magazine containing five cartridges and a "Winchester" ammunition box containing two cartridges were found in Woods' residence. Three bullets were retrieved from Boyd's body. Four cartridge cases were found at the scene of the crime. These articles were sent to the Federal Bureau of Investigation for examination. The laboratory report of the Bureau, received in evidence, disclosed that the bullets in Boyd's body were fired from the barrel of the pistol found in Woods' residence. The cartridge cases found at the scene of the crime were fired in the pistol. The bullets recovered from Boyd's body and the cartridge cases found at the scene of the crime were "components of ammunition" like those comprising the cartridges in the magazine and ammunition box found in Woods' residence. The report continued:

The ... pistol functioned normally when test fired in the Laboratory. The trigger pull ... was measured to be approximately five pounds, which is considered normal for a firearm of this type. The ... magazine [found in Woods' residence] is manufactured for this type of pistol. [It] and [the magazine in the pistol] will each hold nine cartridges.

The report of the Federal Bureau of Investigation supplied evidence legally sufficient to show that a handgun was used to kill Boyd. We conclude that the evidence showed directly, or supported rational inferences, from which the trial judge could properly be convinced beyond a reasonable doubt that Woods was guilty of using a handgun in the commission of the felony of murder.

Woods has not prevailed on any of his contentions. We, therefore, affirm the judgments of the Circuit Court for

**624**

Anne Arundel County.[12]
JUDGMENTS OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.

12. On 9 February 1988 in the Circuit Court for Anne Arundel County, Donald A. Dare pleaded guilty to the first degree murder and the attempted murder of Michael Boyd. The court found him guilty of those offenses and sentenced him to life imprisonment on the murder conviction and to a concurrent sentence of life imprisonment with all but 5 years suspended on the attempted murder conviction. Six related charges were nol prossed.

On 4 February 1988, Jody Boyd was found guilty at a court trial in the Circuit Court for Anne Arundel County of the first degree murder of Michael Boyd, the attempted murder of him, and conspiracy to murder him. She was sentenced to life imprisonment without the possibility of parole on the murder conviction and to concurrent life sentences on the other convictions. On review of the sentences, the panel struck the parole provision. On appeal, the Court of Special Appeals affirmed the judgments. *Boyd v. State*, 79 Md.App. 53, 555 A.2d 535, (1989).

As to James Hayes, the State, in exchange for his testimony, agreed not to oppose his being tried as a juvenile.