976 P.2d 250

STATE of Arizona, Appellee,

v.

Charles Vincent WAGNER,
Jr., Appellant.

No. 1CA–CR 97–0092.

Court of Appeals of Arizona,
Division 1, Department E.

Aug. 13, 1998.

Review Granted April 12, 1999.

Grant Woods, The Attorney General By Paul J. McMurdie, Chief Counsel Criminal Appeals Section and Diane M. Ramsey, Assistant Attorney General, Phoenix, for Appellee.

Dean W. Trebesch, Maricopa County Public Defender By James R. Rummage, Deputy Public Defender, Phoenix, for Appellant.

## OPINION

SULT, Presiding Judge.

¶ 1    Charles Vincent Wagner, Jr. ("appellant") appeals from his convictions and sentences for first degree murder and attempted armed robbery. For the following reasons, we affirm.

## BACKGROUND

¶ 2    In June 1994, four teenagers, Damon Bellamy, Jason Miller, Mike Gibson, and appellant, went to a Smitty's grocery store to steal either a purse or an automobile. Appellant was armed with a .380 semi-automatic pistol and Gibson was armed with a .22 revolver. When they arrived at the grocery store parking lot, Bellamy and Miller went to one area of the lot while appellant and Gibson went to another.

¶ 3    After about forty minutes, appellant noticed Mrs. F. ("the victim") placing her groceries in her car. As the victim returned her shopping cart to the cart return area, appellant signaled to the others that he was going to rob her. With Gibson close behind, appellant jogged to the victim's car and pulled the driver's door open just before the victim closed it. Appellant struck the victim with either the gun or his fist, and the victim fell onto the passenger seat. When the victim screamed, appellant shot her several times. The victim managed to get out of the car, call for help, and walk towards the grocery store before collapsing and dying in the parking lot.

¶ 4    The teenagers fled the scene. Miller went to a nearby restaurant while appellant, Bellamy, and Gibson ran to the home of their friend, Robert Wagner. Appellant told Robert that he had "just popped some old lady at Smitty's." Robert observed appellant wiping his fingerprints from a .380 pistol, and listened as appellant explained that his gun accidentally discharged while he was "jack[ing][a] lady for her car." Appellant said he "panicked" after the initial shot and "just unloaded the clip on her and ran."

¶ 5    Appellant was soon apprehended and charged as a juvenile. The juvenile court transferred appellant for trial in adult court on charges of first degree murder and attempted armed robbery. Appellant's first trial ended in a mistrial when the jury deadlocked.

¶ 6    At the second trial, appellant was convicted on both counts. The state had requested the death penalty, and the trial court therefore conducted a sentencing hearing and made extensive findings regarding aggravating and mitigating factors. After weighing those factors, the trial court found it inappropriate to impose the death penalty, and instead sentenced appellant to life imprisonment without the possibility of release on the murder charge ("natural life"), and to a consecutive seven and one-half year term on the attempted armed robbery charge. Appellant timely appealed.

## ISSUES

¶ 7    Appellant argues that his natural life sentence must be vacated because the portion of Arizona Revised Statutes Annotated ("A.R.S.") section 13–703(A) (Supp.1997) which authorizes its imposition is constitutionally infirm under the Eighth and Fourteenth Amendments to the United States Constitution.[1] Appellant also argues that his convictions must be reversed because the trial court admitted autopsy photographs of the victim that unfairly prejudiced the jury.

## ANALYSIS

### I.  The Natural Life Sentence and Sentencing Guidelines

¶ 8    Section 13–703(A) provides the trial court with discretion to impose either the death penalty or life imprisonment when a defendant is found guilty of first degree murder. In deciding whether the death penalty is appropriate, the trial court must hold a sentencing hearing to determine and weigh aggravating and miti-gating circumstances.

---

1.  Appellant also cites to the Due Process and Equal Protection Clauses of the Arizona Constitution but offers no separate analysis of the impact that these clauses might have on the sentencing issue. Consequently, we decline to address these provisions separately. *See Nationwide Resources Corp. v. Massabni*, 134 Ariz. 557, 565, 658 P.2d 210, 218 (App.1982).

A.R.S. §§ 13–703(B),(E),(F),(G) (Supp.1997). If the court determines that a death sentence is not appropriate, it must impose a life sentence. A.R.S. § 13–703(A). In doing so, the court has the discretion to impose either a natural life term or life with possibility of release after serving a specified number of years. *Id.*

¶ 9 Appellant focuses on the fact that in exercising this discretion regarding the life sentencing options, the legislature has not provided the court with any guidelines directing how it is to choose between the options. Appellant contrasts this with the sentencing procedure required for all other offenders facing sentencing for a felony. Under this procedure, A.R.S. section 13–701 (Supp.1997) establishes five classes of felonies, with a term of imprisonment presumed to be appropriate for each class of felony. A.R.S. sections 13–702, 13–702.01 and 13–702.02 (Supp. 1997) permit the sentencing judge to impose a term greater than the presumptive up to a specified maximum, or a term less than the presumptive down to a specified minimum, upon a finding and weighing of statutorily defined aggravating or mitigating circum stances. This scheme is also applied to sentencings for second degree murder, a class 1 felony. *See* A.R.S. §§ 13–710, 13–1104 (Supp.1997).

¶ 10 Appellant describes this sentencing scheme as one providing guidelines which objectively circumscribe the sentencing judge's discretion and result in comparable sentences for felons similarly situated. However, this guideline approach is not available for felons convicted of first degree murder but not sentenced to death. Appellant asserts that this lack of circumscribed discretion permits the sentencing judge to make an arbitrary choice between the two life sentences to which such offenders are subject. According to appellant, this constitutes a violation of both the Due Process and Equal Protection Clauses of the Fourteenth Amendment and the Eighth Amendment pro-

hibition of cruel and unusual punishment. We address each argument in turn.[2]

## A. Due Process

■ ¶ 11 The first prong of appellant's due process analysis asserts that the sentencing judge's "unfettered" discretion in selecting a life sentence option renders that portion of section 13–703(A) void for vagueness. The vagueness doctrine essentially provides that a person cannot be liable for conduct he could not reasonably have known was a violation of the law. *See Colautti v. Franklin,* 439 U.S. 379, 390, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979). The doctrine is directed at statutes which may suffer from either of two vices. First is a statute that fails to give a person of ordinary intelligence fair notice that contemplated conduct is forbidden. *Id.* Second is a statute so indefinite that " 'it encourages arbitrary and erratic arrests and convictions.' " *Id.* (quoting *Papachristou v. Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972)). While appellant is not precise as to exactly how section 13–703(A) violates the vagueness doc-trine, we presume that he is arguing that the lack of sentencing guidelines encourages an arbitrary and discriminatory selection of a life sentencing option.

■ ¶ 12 Appellant's argument is misfocused. The vagueness doctrine is aimed at laws that require or proscribe conduct. *United States v. Wivell,* 893 F.2d 156, 159 (8th Cir.1990). However, the challenged portion of section 13–703(A) has nothing to do with directing or prohibiting the conduct of the citizens of Arizona. Rather, it directs the sentencing function of a judge. As such, section 13–703(A) is not subject to analysis under the vagueness doctrine. *See Wivell,* 893 F.2d at 159–60 (holding that federal sentencing guidelines do not define illegal conduct but are directives to sentencing judge, not citizens at large, and are thus not susceptible to a vagueness attack); *see also Woods*

---

**2.** Appellant did not object below to the statutory sentencing provision or the imposition upon him of a natural life sentence. Nevertheless, we address the merits of appellant's arguments "in accordance with our absolute duty to protect constitutional rights." *See State v. Cassius,* 21

Ariz.App. 78, 82–83, 515 P.2d 903, 907–08 (1973) (addressing constitutionality of statute creating separate criminal offense for felony committed on bail, despite defendant's failure to raise the argument in the trial court).

*v. State,* 315 Md. 591, 556 A.2d 236, 241–42 n. 4 (Md.App.1989) (questioning whether vagueness doctrine covers alleged lack of statutory specificity as to sentencing procedures).

¶ 13 Appellant's second due process argument is that his fundamental liberty interest is at stake and thus procedural due process requires that sentencing guidelines be included as part of the sentencing process in all instances. The question created by this argument is whether the inclusion of guidelines as part of the sentencing process is required in order to ensure that the sentencing procedure is fundamentally fair.

¶ 14 Most courts that have considered this argument in a similar context have summarily found no procedural due process right to sentencing guidelines. *See, e.g., Vines v. Muncy,* 553 F.2d 342, 346–47 (4th Cir.1977) (holding that when a state chooses not to require precise criteria in jury sentencing, nothing in the Due Process Clause intrudes upon that choice); *Wicks v. State,* 270 Ark. 781, 606 S.W.2d 366, 368 (Ark.1980) ("[W]e adhere to our view that such guidelines are unnecessary except in capital cases."); *Goff v. State,* 515 N.E.2d 1121, 1123 (Ind.1987) (holding that there is no lack of due process in permitting sentencing judge to choose between life sentence or term of years, notwithstanding there were *no statutory guidelines* to aid court in choice); *Woods,* 556 A.2d at 242 ("In the absence of statutory mandates, nothing in the law requires that Guideline sentences or principles be applied; they complement rather than replace the exercise of discretion by the trial judge."). At least one court, however, has gone a step further and extensively analyzed whether procedural due process requires sentencing guidelines.

¶ 15 In *Britton v. Rogers,* 631 F.2d 572 (8th Cir.1980), a habeas appeal, the defendant had been convicted of rape and sentenced to a life term by an Arkansas jury pursuant to a statute which permitted a sentence of thirty years to life. *Id.* at 578. The jury had not been instructed on any guidelines which would direct its sentencing discretion and Arkansas law provided none. *Id.* In the habeas proceeding, the defendant argued, *inter alia,* that this lack of sentencing guidelines violated procedural due process. *Id.* at 579.

¶ 16 The *Britton* court reversed the district court's grant of relief, but in doing so it declined to dismiss defendant's argument summarily. Rather, it decided to test the defendant's procedural due process argument pursuant to the balancing approach articulated in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) for identifying the requirements of procedural due process in a noncriminal context. The *Britton* court determined that this test, which had been developed for use in the administrative context to identify private interests worthy of protection, would be useful in the criminal area as well. *Britton,* 631 F.2d at 580.

¶ 17 *Britton* delineated the *Eldridge* factors involved in the balancing process:

> "[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement will entail."

*Id.* at 579–80 (quoting *Eldridge,* 424 U.S. at 334–35, 96 S.Ct. 893). To apply the test, a court must determine whether the private interest in a particular procedure substantially outweighs the government's interest in maintaining the *status quo. Id.* at 580. If so, the Due Process Clause mandates implementation of that particular procedure. *Id.*

¶ 18 We agree with the *Britton* court that the *Eldridge* approach provides a useful tool in analyzing procedural due process claims which arise in the criminal law context. We therefore turn to an analysis of Arizona's procedure, applying the *Eldridge* test.

¶ 19 The first step is to identify what interest of appellant is implicated by the sentencing process. Contrary to appellant's argument, his "liberty" interest, traditionally recognized and stringently protected in due

process jurisprudence, *see Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), was no longer implicated once he was convicted. The United States Supreme Court in *Gardner v. Florida*, 430 U.S. 349, 358, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) clearly held that a criminal conviction extinguishes whatever liberty interest a person possesses. This does not mean that a person has no interest in the procedures used in sentencing or that procedural due process is not applicable in that context. Rather, it simply means that the stringency associated with the procedures required to obtain a valid conviction is somewhat lessened when the process moves from conviction to sentencing.

■ ¶ 20 The *Gardner* court identified a person's interest in the sentencing procedure as a "legitimate interest in the character of the procedure which leads to the imposition of sentence." *See Britton*, 631 F.2d at 580 (quoting *Gardner*, 430 U.S. at 358, 97 S.Ct. 1197). We construe this interest to include, at the least, an interest that sentencing not be wholly arbitrary or capricious. *See State v. Fillmore*, 187 Ariz. 174, 184, 927 P.2d 1303, 1313 (App.1996) (stating that it is an abuse of discretion for a trial court to arbitrarily or capriciously impose sentence). Such an interest is sufficiently important to require some attention to the procedures employed in sentencing. Put another way, this interest is significant enough to trigger an *Eldridge* analysis as to whether the addition of sentencing guidelines to the section 13–703(A) life sentencing procedure is mandated by the Due Process Clause.

¶ 21 The more difficult issue is whether sentencing guidelines have any significant value in ensuring the sentencing process is not arbitrary or capricious, the second *Eldridge* factor. Appellant suggests that one indicator of such value may be found in the United States Supreme Court's death penalty jurisprudence. Founded on the Eighth Amendment's proscription of cruel and unusual punishment, this jurisprudence has evolved into a rule of channeled discretion provided by guidelines "so as to minimize the risk of wholly arbitrary and capricious action" in imposing the death penalty. *Gregg*

*v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). However, the United States Supreme Court has refused to find any similar constitutional mandate for guideline sentencing in the noncapital context. *See Harmelin v. Michigan*, 501 U.S. 957, 995, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) ("Our cases creating and clarifying the 'individualized capital sentencing doctrine' have repeatedly suggested that there is no comparable requirement outside the capital context, because of the qualitative difference between death and all other penalties."). From *Harmelin*, we draw the inference that when death is the prescribed penalty, any procedure which might possibly ensure that death is appropriately meted out has some value and this would include sentencing guidelines. Such guidelines, however, have insufficient value to merit inclusion in noncapital sentencing as a due process mandate.

¶ 22 Another indicator that guidelines have value may be inferred from the Arizona legislature's rejection in 1978 of the former system of indeterminate sentencing, which provided no guidelines to sentencing judges. *See* A.R.S. § 13–1643 (1956), *repealed by* 1977 Ariz. Sess. Laws 678, 706–21, 800. The theory underlying indeterminate sentencing was that by focusing almost entirely on the individual offender, "[r]ehabilitating the offender would thereby be maximized, as would the interest of the public in being protected against further criminal acts." 1 Rudolph J. Gerber, **Criminal Law of Arizona** ch. 7, at 702–8 (2d ed.1993).

¶ 23 Many criticisms were directed at indeterminate sentencing, not the least of which were accusations of significant disparities in sentencing, resentment at arbitrary and capricious actions by judges and parole agencies, and a perceived inability of the correctional system to rehabilitate offenders. *Id.* at 702–9. Consequently, Arizona opted for an entirely different sentencing scheme for felonies in 1978, incorporating the concept of the presumptive term, variable upward or downward only by specific findings made according to legislatively supplied guidelines. *See* A.R.S. §§ 13–701, 13–702, 13–702.01, 13–702.02. The result was that the sentencing discretion previously exercised by judges was

severely curtailed and what remained was circumscribed by legislatively created guidelines. *See* Gerber, *supra,* at 702–9. In adopting this procedure the legislature in effect pronounced its belief that such sentencing would reduce "disparity and inconsistency in sentencing." *See State v. Bly,* 127 Ariz. 370, 372, 621 P.2d 279, 281 (1980).

¶ 24  In evaluating Arizona's use of guideline sentencing, it is appropriate to inquire whether the legislative goals of uniformity and consistency have been achieved since the enactment of the revised scheme. At least one commentator believes the present system is, if anything, worse than the former system and has failed to achieve consistency, predictability, and fairness in sentencing. *See* Rudolph J. Gerber, **Arizona Criminal Code Revision: Twenty Years Later,** 40 Ariz. L.Rev. 143, 143–44 (1998). Perhaps the most relevant criticism is that guided discretion in sentencing is an illusion, since in practice it is the prosecutor, with unbridled discretion, who makes the ultimate sentencing decisions by choosing what to charge, whether and what to plea bargain, whether to seek sentencing enhancements, or whether to stipulate to a sentence. *Id.* at 164–65; *see also State v. Barger,* 167 Ariz. 563, 570, 810 P.2d 191, 198 (App.1991) ("[W]e express our concern that a junior officer in the executive branch of county government (deputy county attorney) is given great discretion and power to affect sentencing in a state court while denying to the state judicial officer who presides over that court any discretion in what has traditionally and inherently been a function of the court."). In light of the actual experience under the revised scheme, we remain unconvinced that guideline sentencing as practiced in Arizona has significantly reduced instances of significant and unwarranted disparities in sentencings between similarly situated offenders.

¶ 25  The second *Eldridge* factor also directs that we examine those existing aspects of Arizona's sentencing procedure that are applicable to appellant and afford him protection from arbitrary or capricious treatment. Our supreme court has held that "[c]onvicted defendants have a due process right to a fair sentencing procedure which includes the right to be sentenced on the basis of accurate information." *State v. Grier,* 146 Ariz. 511, 515, 707 P.2d 309, 313 (1985). This requires that before sentencing, the trial court must conduct an adequate investigation into facts necessary for an intelligent exercise of its sentencing power. *State v. Stotts,* 144 Ariz. 72, 87, 695 P.2d 1110, 1125 (1985). Finally, the trial court must exercise its discretion to individualize the sentence imposed on a defendant, within the applicable statutory parameters, and may not resort to a pre-determined mechanical and inflexible process which fails to account for the particular offender and his offense. *Fillmore,* 187 Ariz. at 184, 927 P.2d at 1313.

¶ 26  In furtherance of these objectives, our Rules of Criminal Procedure require the trial court to conduct a pre-sentence investigation, reflected in a pre-sentence report, in every case in which it has discretion over the penalty to be imposed. Rule 26.4, Ariz. R.Crim. P. The defendant has the right to have the court consider any mitigating factors and has the absolute right to a pre-sentence hearing at which to present these factors. Rule 26.7, Ariz. R.Crim. P. The defendant also has the right to object to any information presented in the pre-sentence report and secure its correction if inaccurate. Rule 26.8, Ariz. R.Crim. P.

¶ 27  These procedural mechanisms make it clear that no trial judge in Arizona, including the judge who sentenced appellant in this matter, has "unfettered" discretion in sentencing an offender. The fact-finding process, deemed crucial by *Eldridge* in a due process analysis, *see Britton,* 631 F.2d at 580, is protected in the sentencing process by the rules' requirements for an investigation, report, objections to the report, and a hearing. The mandate for a fair sentencing process and individualized consideration of the offender and his offense is dictated by our jurisprudence.

¶ 28  Summarizing the considerations under the second *Eldridge* factor, no court has persuasively established that guideline sentencing significantly reduces unwarranted sentencing disparities in the noncapital context. Arizona's particular experience is not to the contrary. We therefore conclude that

guideline sentencing, as statutorily structured and practically applied in Arizona, would not add any significant procedural protection for an offender in appellant's position.

¶ 29   The last *Eldridge* factor focuses on the governmental interests at stake. One of the primary governmental interests was identified by the United States Supreme Court when it acknowledged that "legislatures remain free to decide how much discretion in sentencing should be reposed in the judge or jury in noncapital cases." *Lockett v. Ohio,* 438 U.S. 586, 603, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *see also Monge v. California,* 524 U.S. 721, ——, 118 S.Ct. 2246, 2253, 141 L.Ed.2d 615, 627–28 (1998) ("Where noncapital sentencing proceedings contain trial-like protections, that is a matter of legislative grace, not constitutional command."). This underscores that a state has a significant interest in retaining what is, in essence, the right to experiment in sentencing in order to achieve as fair and just a system as possible. Arizona's own experience illustrates the importance of that interest.

¶ 30   It is fair to describe the present sentencing system as an evolutionary consequence of Arizona's continuing experimentation with the sentencing decision-making process. The experiment was undertaken, in part, in an attempt to achieve consistency, predictability and fairness in sentencing. While this experiment has been justifiably criticized, the point is that the present system, including the use of guidelines, may not be the last attempt by the Arizona legislature to revise its sentencing scheme. It is not inconceivable that the legislature may experiment further; perhaps it may return to some version of indeterminate sentencing where guidelines are irrelevant. This freedom to experiment is a governmental interest of some consequence.

¶ 31   We now turn to the application of the *Eldridge* balancing test. We must weigh appellant's interest in a fair sentencing process, together with the contribution that sentencing guidelines may make to such fairness, against the state's interest in maintaining the freedom to continue experimenting with the sentencing process. In doing so, we conclude that little, if anything, would be gained in the way of fairness by mandating guidelines as part of the sentencing process. On the other hand, further experimentation with the sentencing decision-making process could be impeded, if not entirely prevented, if we were to accede to appellant's request to permanently affix guidelines as a required component of our sentencing procedure. We therefore conclude that in this context, appellant's interest in adding guidelines does not substantially outweigh the state's described interest. *See Eldridge,* 424 U.S. at 334–35, 96 S.Ct. 893. In sum, procedural due process does not require that sentencing guidelines be required as part of the sentencing process under section 13–703(A).

## B.   Equal Protection

¶ 32   In formulating his equal protection challenge, appellant's first requirement is to define the larger class, the members of which are entitled to equal treatment because all are similarly situated. According to appellant, this class is all felony offenders not actually sentenced to death for first degree murder; or, put another way, all felony offenders subject to noncapital sentencing. Appellant asserts that all members of this class are entitled to the same treatment in the method of arriving at sentencing decisions.

¶ 33   Appellant must next establish that the statutory system of which he complains has a different and negative impact on his portion of the class. *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 17, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Appellant describes his portion of the class as all offenders subject to the life sentencing options of section 13–703(A). According to appellant, those members of the larger class who are subject to sentencing for other than first degree murder have the benefit of sentencing guidelines which circumscribe judicial discretion in selecting an appropriate sentence. On the other hand, those members of the class who are subject to the alternative life sentencing provisions of section 13–703(A) are unfairly disadvantaged by being subject to potentially arbitrary judicial decision-making. The constitutional vice in

this approach, appellant reasons, is that there are no distinguishing characteristics between class members which could justify not including his portion of the class with those who receive the favorable treatment of guideline sentencing. *See Barnhorst v. Missouri State High School Activities Ass'n*, 504 F.Supp. 449, 459 (W.D.Mo.1980).

¶ 34 In addressing an equal protection challenge, we must initially determine whether the appellant has presented a colorable claim of a violation. That is, we must determine whether the statutory system complained of in fact has a disparate impact on similarly situated persons. *Rodriguez*, 411 U.S. at 17, 93 S.Ct. 1278. It is not enough, however, that different members of a class alleged to be similarly situated merely are treated differently. There must be "a substantial disparate impact" on those members of the class complaining of the differing treatment. *Califano v. Boles*, 443 U.S. 282, 293–94, 99 S.Ct. 2767, 61 L.Ed.2d 541 (1979). Moreover, because legislation is presumed constitutional, a challenge will succeed only upon a clear showing of a significant disparate impact. *Cf. Lerma v. Keck*, 186 Ariz. 228, 232–33, 921 P.2d 28, 32–33 (App.1996).

¶ 35 At first blush, appellant appears to have established a colorable claim requiring scrutiny under the Equal Protection Clause. We agree that all offenders subject to non-capital sentencing belong to the same class. We also acknowledge that appellant's portion of the class is subject, in part, to a different sentencing scheme than the remainder of the class.

¶ 36 Appellant's argument, however, does not withstand closer analysis. The argument is flawed by being premised on an unwarranted and unproven assumption; namely, that sentencing guidelines provide a benefit to an offender being sentenced thereunder and that an offender sentenced without such guidelines is disadvantaged.

¶ 37 In the due process section, we explained that guidelines are not of proven value in reducing instances of arbitrary sentencings and that the procedural devices available to appellant and his portion of the class adequately protect the fairness of the sentencing process. Thus, we conclude that appellant has not and cannot prove that the absence of sentencing guidelines in section 13–703(A) creates a "substantial disparate impact" on his portion of the class. *Califano*, 443 U.S. at 292, 99 S.Ct. 2767. Appellant's proof having failed, *see Lerma*, 186 Ariz. at 232–33, 921 P.2d at 32–33, we need go no further with an equal protection analysis to determine the degree of scrutiny to which the classification should be subject or the basis on which the classification may be justified.

## C. Eighth Amendment

¶ 38 Appellant's last argument is simply that the United States Supreme Court's Eighth Amendment-derived requirement of sentencing guidelines in death penalty cases should be applied to sentences of life imprisonment. The same assertion has been rejected by numerous courts, including the United States Supreme Court itself. *See Harmelin*, 501 U.S. at 995–96, 111 S.Ct. 2680; *Britton*, 631 F.2d at 578–79; *Wicks*, 606 S.W.2d at 368; *Goff*, 515 N.E.2d at 1123; *Woods*, 556 A.2d at 243–44. Because appellant fails to provide any rationale why, under the proscription of cruel and unusual punishment, the imposition of a life sentence demands the same precautions mandated in capital cases, we likewise reject it.

## II. The Autopsy Photographs

¶ 39 At trial, the judge admitted five autopsy photographs which were designated as Exhibits 65–69.[3] Under Rule 403 of the Arizona Rules of Evidence, the trial judge has discretion to admit a relevant photograph of a murder victim. *State v. Girdler*, 138 Ariz. 482, 487, 675 P.2d 1301, 1306 (1983). Absent an abuse of that discretion, we will not disturb a trial judge's decision to admit such evidence. *Id.* An abuse of discretion is " 'an exercise of discretion which is manifestly unreasonable, exercised

---

**3.** It is not clear from his opening brief whether appellant contests the admission of each exhibit. Appellant directly addresses only Exhibits 65 and 66, and does not specifically discuss Exhibits 67, 68, and 69. We nonetheless address the admission of each exhibit.

on untenable grounds or for untenable reasons.'" *State v. Woody*, 173 Ariz. 561, 563, 845 P.2d 487, 489 (App.1992) (quoting *Williams v. Williams*, 166 Ariz. 260, 265, 801 P.2d 495, 500 (App.1990)).

¶ 40 When analyzing the admissibility of a photograph of a murder victim, the trial court is to make a threshold inquiry into whether the photograph is relevant. *State v. Chapple*, 135 Ariz. 281, 288, 660 P.2d 1208, 1215 (1983); Rule 401, Ariz. R. Evid. Assuming the trial court finds the photograph initially relevant, it next examines the tendency of the photograph to emotionally "inflame" the jurors against the defendant. *Chapple*, 135 Ariz. at 288, 660 P.2d at 1215. If the photograph might inflame the jury, the trial court must then assess its probative value, excluding the photograph from evidence only if the danger of prejudice from the photograph substantially outweighs its probative value. *Id.; State v. Murray*, 184 Ariz. 9, 28, 906 P.2d 542, 561 (1995); Rule 403, Ariz. R. Evid.

¶ 41 We agree with the trial court that these photographs are initially relevant. *See Murray*, 184 Ariz. at 28, 906 P.2d at 561 (stating that photographs of a murder victim are relevant "if they aid the jury in understanding an issue"). Regarding the photographs' tendency to inflame, we have independently reviewed the photographs and the record to make this determination. Exhibit 65 is a color photograph of the victim's face showing traces of blood and assorted injuries on her forehead and nose. Exhibit 66 is a color photograph of the victim's chest wound showing gunpowder residue in the form of soot and a stippling pattern.[4] Exhibit 67 is a color photograph of the victim's shoulder and ear indicating stippling and a powder burn mark. Exhibits 68 and 69 are color photographs of the victim's hands indicating stippling and gunpowder residue.

¶ 42 The photographs of the victim's hands, Exhibits 68 and 69, are not even arguably inflammatory. Exhibits 65–67 do have some inflammatory potential, but are not especially gruesome. *See State v. Lee*, 189 Ariz. 608, 615, 944 P.2d 1222, 1229 (1997) (holding autopsy photographs admissible when photographs did not include body parts irrelevant to the crime and excess blood was cleansed from wound and surrounding skin), *cert. denied*, ── U.S. ──, 118 S.Ct. 1192, 140 L.Ed.2d 321 (1998). As to Exhibits 65–67 then, we proceed to the next step of the analysis to determine whether the danger of prejudice from those photographs substantially outweighed their probative value.

¶ 43 In that connection, appellant argues that these photographs lacked probative value because they did not prove "anything which was actually contested." It is true that photographs that do not prove or disprove a contested fact usually are not admissible. *Chapple*, 135 Ariz. at 288, 660 P.2d at 1215. However, a photograph does not necessarily lack probative value when it helps prove only uncontested issues. *State v. Dickens*, 187 Ariz. 1, 18, 926 P.2d 468, 485 (1996) (stating that a defendant's "tactical decision not to contest an essential element of the offense" does not relieve the state's burden of proving each element of the alleged crime), *cert. denied*, ── U.S. ──, 118 S.Ct. 311, 139 L.Ed.2d 240 (1997). Such photographs still have probative value if they tend to corroborate state witnesses, illustrate or explain testimony, or determine the degree of the crime. *State v. Moorman*, 154 Ariz. 578, 586, 744 P.2d 679, 687 (1987).

¶ 44 In this case, Exhibit 65 indicates that the victim suffered several injuries to her face. The exhibit therefore helped corroborate Bellamy's and Miller's testimony that appellant struck the victim before shooting her. Exhibit 66 depicts soot and stippling patterns near the victim's chest wound. Although the state's medical examiner did not specifically use this photograph to describe the victim's injuries, the photographic representation of the soot and stippling patterns could have helped the jury understand the examiner's testimony regarding these phenomena. Exhibit 67 revealed stippling and a powder burn on the victim's shoulder

---

**4.** The medical examiner testified that soot and stippling patterns are "an index of how close the

barrel of the gun [was] to the target."

and ear. During his testimony, the examiner used this photograph to corroborate the testimony of Bellamy, Miller, and Gibson, who revealed that appellant shot the victim at close range.

¶ 45 Each of these photographs, Exhibits 65–67, had probative value either for corroboration or to aid the jury in understanding testimony in the case. Because these photographs are only marginally inflammatory, we find their prejudicial effect did not substantially outweigh their probative value. The trial court did not abuse its discretion in admitting these photographs.

## CONCLUSION

¶ 46 The life sentencing provisions of section 13–703(A) are constitutional. The trial court did not abuse its discretion in admitting Exhibits 65–69. We therefore affirm appellant's convictions and sentences.

WILLIAM F. GARBARINO, Judge, THOMAS C. KLEINSCHMIDT, Judge, concur.